**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BUDICAK, INC., BLUE MARLIN ARBITRAGE, LLC, and PRIME TRADING, LLC, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> - against - <br><br><br> LANSING TRADE GROUP, LLC, CASCADE COMMODITY CONSULTING, LLC, and JOHN DOES NOS. 6-10, <br><br> Defendants. | Case No. 18 C 4966 <br><br> Judge Edmond E. Chang <br><br><br> **JURY TRIAL DEMANDED** |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Budicak, Inc., Blue Marlin Arbitrage, LLC, and Prime Trading, LLC (collectively, "Plaintiffs") complain upon knowledge as to themselves and their own acts and upon information and belief[1] as to all other matters against Defendants Lansing Trade Group, LLC ("Lansing"), Cascade Commodity Consulting, LLC ( "Cascade"), and John Does Nos. 6-10 (all together, "Defendants") as follows:

---

[1] Plaintiffs' information includes counsel's investigation, publicly available data from the *Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, In the Matter of: Lansing Trade Group, LLC,* CFTC No. 18-16 (Jul. 12, 2018) ("Lansing CFTC Order") and the communications quoted in the Lansing CFTC Order (ECF No. 25); the *CME Group Inc. Notice of Disciplinary Action,* CBOT-15-0160-BC (Jul. 12, 2018) ("Lansing CME Notice"); *Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, In the Matter of: Peter Grady,* CFTC No. 18-41 (Sept. 26, 2018) ("Grady CFTC Order"); *Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, In the Matter of: Adam Flavin,* CFTC No. 18-40 (Sept. 26, 2018) ("Flavin CFTC Order"); *CME Group Inc. Notice of Disciplinary Action,* CBOT-15-0160-BC-3 (Sept. 26, 2018) ("Grady CME Notice"); *CME Group Inc. Notice of Disciplinary Action,* CBOT-15-0160-BC-2 (Sept. 26, 2018) ("Flavin CME Notice"); news articles; and other information. Given the concealed and secretive nature of Defendants' manipulation, more evidence supporting the allegations in this Amended Complaint will be uncovered after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     Defendants manipulated wheat futures and options contracts traded on the Chicago Board of Trade ("CBOT") from at least February 1, 2015 through March 31, 2015 (the "Class Period"), in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* (the "CEA"), the Sherman Antitrust Act, 15 U.S.C. § 1, and common law.

2.     Lansing is an international commodity merchandising company and is active in the physical wheat and wheat futures markets. Lansing buys, sells, handles, and stores physical wheat in the cash market and transacts in wheat futures and options. Cascade is a daily cash wheat newsletter that broadcasts information about the wheat market, including news, weather, and global wheat supply and demand.[2] Plaintiffs and the Class are traders of wheat futures and options.

3.     During the Class Period, Defendants caused artificial prices in CBOT wheat futures and options contracts in a coordinated plan to send—in their words—a "signal"[3] to the market that there was demand for wheat by canceling wheat shipping certificates. This demand was artificial. The signal created artificial prices and was designed by Defendants to manipulate CBOT wheat futures and options to benefit their positions at the expense of Plaintiffs and the Class.

4.     A shipping certificate is an interest in physical wheat that can be registered on the CBOT and used to satisfy delivery obligations against CBOT wheat futures contracts. If someone registers a large number of shipping certificates, the market perceives a lack of demand for the wheat (because a large supply has been made available that could be delivered against the futures contract).

---

[2] This Court directed Lansing to provide discovery as to the identity of the John Doe Defendants identified in the initial Class Action Complaint. The discovery led to the identification of Cascade, named as a Defendant here, and others were identified as Lansing employees and a Lansing executive  Lansing also identified another anonymous individual, the "Market Participant," from the initial Class Action Complaint as ███████████ whose employer remains unknown to Plaintiffs.  As discussed below, recent CFTC orders identify additional co-conspirators who remain unknown to Plaintiffs and are identified in the caption as John Does 6-10.

[3] *See* Grady CFTC Order at 5.

That excess supply (and lack of demand) causes prices of wheat futures and options to decrease. On the other hand, the owner of a shipping certificate can "cancel" the certificate for load out, which is the first step in taking delivery of that wheat and an indicator to the market that the owner wants the physical wheat (a signal of decreased supply and increased demand). Less supply (and more demand) increases prices of wheat futures and call options contracts.

5.     Coming into March 2015, Lansing held 134 shipping certificates, which it had registered with the CBOT. Then, on March 3, Lansing received advance word that a market participant would be registering many more shipping certificates with the CBOT—the first time new shipping certificates were registered with the CBOT in several weeks. Lansing knew this would impact prices. The registration occurred later in the day on March 3, as Lansing knew it would, and signaled to the market a lack of demand for the wheat. Prices of wheat futures and call options moved lower.

6.     After prices dropped, Lansing capitalized and began increasing its long wheat spread and related options positions at the newly suppressed price—knowing all along that Defendants planned to manipulate those prices upward after establishing the position. Then, between March 5 and 10, Lansing traders purchased all 250 of the certificates that were tendered on March 3. It had no commercial need for the wheat. Yet it planned to cancel those certificates for load out (the first step someone *would* take if he needed and wanted to take delivery of wheat). This would signal a false demand for wheat, and thereby reverse the market that had been depressed by the 250 certificates having been tendered in the first place.

7.     After acquiring the 250 shipping certificates, with the 134 it previously held, Lansing now owned 384 shipping certificates. This is a massive amount of wheat. Each shipping certificate represents 5,000 bushels of wheat, so 384 shipping certificates is 1.92 million bushels or 115.2 million pounds of wheat. This was 100% of the shipping certificates registered with the CBOT at the time.

8.      With its long futures and related options positions established, and its ownership of all outstanding registered shipping certificates (384 in total) set, Lansing began artificially pumping the value of its position. It did this in two ways: (1) It primed the market by having co-conspirators (market participants including a wheat market newsletter writer: ███████████████████████████ ███████ circulate rumors that a large market participant may be canceling a large number of wheat certificates for load out because there was demand for the wheat; and (2) It canceled the shipping certificates for load out, which signaled to the market significant demand for the wheat.

9.      On March 6, 2015, Lansing canceled 316 shipping certificates and ████████████ [4] ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████ And Defendants went a step further by not only canceling the certificates for load out, but also feigning that they needed the wheat by setting up transport of the bushels, too: "the important thing is just to get transportation in Chicago and get that s**t moving. Because what's gonna be more impressive is when they start seeing things move. . . . and if I need to donate something to the funds, I'll gladly go through and do that." [6] Prices artificially spiked in response to the false signal: ████████████████████████████████████████████ ████████████████████ [7] At the time, no one outside of the conspiracy knew Defendants were behind it, ████████████████████████ [8]

---

[4] ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████

[6] Grady CFTC Order at 6. *Available at* https://www.cftc.gov/PressRoom/PressReleases/7804-18.

[7] ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████

10.     On March 10, 2015, Lansing canceled the remaining 68 certificates, which left no remaining shipping certificates registered with the CBOT. As a result, prices artificially increased more.

11.     Lansing's futures and options position profited handsomely: ████████████ ██████████████████████████████████ [9] And Lansing harmed Plaintiffs and Class members who in good faith traded and lost money on CBOT wheat futures and options contracts by trading at artificial prices—they paid too much and received too little on their trades—proximately caused by Lansing's manipulative conduct.

12.     On July 12, 2018, the U.S. Commodity Futures Trading Commission ("CFTC") entered an Order related to Lansing's manipulation of CBOT prices. The Lansing CFTC Order required Lansing to pay a $3.4 million civil monetary penalty, strengthen its internal compliance controls and cease and desist from further violations of the CEA and CFTC Regulations. The CFTC "took into account the [$3.15 million] fine imposed by the CME in its related action," and yet still fined Lansing an additional $3.4 million, bringing the total monetary fine against Lansing up to $6.55 million. [10]

13.     Also on July 12, 2018, the CME Group Inc. (which owns the CBOT) issued a Notice of Disciplinary Action ("Notice") against Lansing arising from the manipulative scheme. Pursuant to an offer of settlement, on May 23, 2018, a Panel of the CBOT Business Conduct Committee found

---

████████████████████████████████████████████████████████████
████████████████████

[9] ███████████████████████████████████████████████████████████.

[10] Press Release, CFTC, CFTC Orders Commodity Trading Firm to Pay $3.4 Million Penalty for Attempted Manipulation of Agricultural Markets (Jul. 12, 2018), *available at* https://www.cftc.gov/PressRoom/PressReleases/7754-18. *See also* Press Release, CFTC, CFTC Charges Two Commodity Traders with Attempted Manipulation of Agricultural Markets (Sept. 26, 2018), *available at* https://www.cftc.gov/PressRoom/PressReleases/7804-18.

that Lansing engaged in a manipulative scheme in connection with CBOT wheat futures and options and the shipping certificates. The CME required Lansing to pay a fine of $3.15 million to the CME.

14.     On September 26, 2018 the CFTC fined Lansing Traders Adam Flavin and Peter Grady, $125,000 and $250,000 respectively for their conduct described herein.

15.     Also on September 26, 2018 the CME fined Lansing Traders Adam Flavin and Peter Grady an additional $125,000 and $250,000 respectively for their conduct described herein. The CME banned Grady from trading for nine months. The CME banned Flavin from trading for four years.

16.     Plaintiffs bring this action on behalf of themselves and those similarly situated to recover damages resulting from Lansing's manipulation of CBOT wheat futures and options prices.

## JURISDICTION AND VENUE

17.     This action arises under Section 22 of the CEA, 7 U.S.C. § 25.

18.     Wheat is a "commodity" in interstate commerce and is the "commodity underlying" CBOT wheat futures and options contracts, as those terms are defined and used in Section 1a(9) and 22 of the CEA, 7 U.S.C. §§ 1a(9) and 25(a)(1)(D), respectively.

19.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, 28 U.S.C. §§ 1331 and 1337.

20.     Venue is proper in the Northern District of Illinois pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), 28 U.S.C. § 1391(b) through (d).

21.     The CBOT wheat futures and options trading was conducted, and Defendants otherwise transacted business, in the Northern District of Illinois. The claims arose in this District. Plaintiffs are headquartered in this District. Other substantial events giving rise to the claims asserted herein occurred in this District.

22.     The CBOT is located in this District at 141 West Jackson Boulevard, Chicago, Illinois, 60604. Defendants' manipulated the prices of CBOT wheat futures and options, which are traded in

this District on the CBOT. The CBOT became a wholly-owned subsidiary of the CME Group Inc. ("CME") in or around July 2007. In July 2018 the CME issued a Notice of Disciplinary Action against Lansing, fining it $3.15 million dollars for the manipulation that is the subject of the CFTC's Order. In September 2018, the CME issued two Notices of Disciplinary Action against Flavin and Grady, fining them 125,000 and 250,000, respectively; and banning them from trading for four years and nine months, respectively.

23. The CBOT is designated by the CFTC as a board of trade. The CBOT applies to the CFTC for permission to trade each commodity in which the CBOT offers a contract. The CBOT must establish, among other things, that the proposed contract is not prone to price manipulation to win approval to trade such contract. CBOT members and clearing members have to follow the rules of the CBOT and CME, including the rules prohibiting manipulation.

24. Defendants, directly and indirectly, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and course of business alleged herein.

## PARTIES

25. Plaintiff Budicak, Inc. ("Budicak") is an Illinois corporation with its principal place of business in Oak Brook, Illinois. Budicak was an active trader of CBOT wheat contracts during the Class Period and traded at artificial prices directly and proximately caused by Lansing's unlawful manipulation. Budicak was deprived of transacting in a lawful, un-manipulated market in CBOT wheat contracts and suffered legal injury as a direct and proximate result of Defendants' manipulative conduct. Budicak traded CBOT wheat contracts (including the May, July and December 2015 wheat futures) during the Class Period, including in March 2015. Budicak's transactions and net changes in positions during the Class Period resulted in a net monetary harm caused by Lansing's manipulation. Because of Defendants' manipulation, Budicak suffered a net loss.

26.     For example, Budicak was short May 2015 futures as of the close of trading on March 10, 2015 and covered this short position on March 11, 2015 by purchasing offsetting May 2015 futures. Wheat futures and options prices were artificially inflated when Budicak was trading because Lansing had canceled 316 shipping certificates on March 6, 2015 and 68 shipping certificates on March 10, 2015. Because of the cancelations, the market reacted by increasing (artificially) prices beginning March 6, 2015 and continuing through and past March 13, 2015. Thus, when Plaintiff Budicak bought May 2015 futures to close out its short position on March 11, 2015, it did so at artificial prices caused by Defendants.  For example, Budicak suffered consistent net losses every day in its May, July and December 2015 wheat futures trades between March 10 and March 20, 2015.

27.     Plaintiff Blue Marlin Arbitrage, LLC ("Blue Marlin") is an Illinois limited liability company with its principal place of business in Evanston, Illinois. Blue Marlin was an active trader of CBOT wheat contracts during the Class Period, and traded at artificial prices directly and proximately caused by Lansing's unlawful manipulation. Blue Marlin was deprived of transacting in a lawful, un-manipulated market in CBOT wheat contracts and suffered legal injury as a direct and proximate result of Defendants' manipulative conduct. Blue Marlin traded CBOT wheat contracts (including the May and July 2015 wheat futures, as well as April, May, June and July 2015 put and call options) frequently during the Class Period, including in March 2015 (in which it executed 700 individual trades). Because of Defendants' manipulation, Blue Marlin suffered a net loss.

28.     For example, Blue Marlin engaged in net long transactions (i.e., its purchases of futures and call options, and sale of put options exceeded its sale of futures and call options and purchases of put options) on March 10-12, 2015. On these days, wheat futures were artificially inflated and related options prices were distorted because Lansing had canceled 316 shipping certificates on March 6, 2015 and 68 shipping certificates on March 10, 2015. Because of the cancelations, the market reacted by increasing (artificially) prices beginning March 6, 2015 and continuing through and past March 13,

2015. Thus, when Blue Marlin engaged in net long transactions on March 10-12, 2015, it did so at artificially high prices caused by Lansing and suffered a loss as a result. For example, at this preliminary stage of the case, Blue Marlin estimates that it suffered a net loss of approximately $500,000.00 from March 6 through March 23, 2015, on transactions in May and July 2015 CBOT wheat futures and options.

29.     Plaintiff Prime Trading, LLC ("Prime Trading") is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Prime Trading is a member firm of the CBOT. Prime Trading was an active trader of CBOT wheat contracts during the Class Period, and traded at artificial prices directly and proximately caused by Defendants' unlawful manipulation. Defendants deprived Prime Trading of transacting in a lawful, un-manipulated market in CBOT wheat contracts. Defendants' conduct herein caused Prime Trading to suffer an economic injury: Prime Trading lost money as a direct and proximate result of Defendants' manipulation. Prime Trading traded CBOT wheat contracts (including May, July, September and December 2015 CBOT wheat futures, as well as CBOT wheat options contracts) during the Class Period, including in March 2015. Prime Trading's transactions and net changes in positions resulted in a net loss of money. For example, from March 6 through March 13, 2015, Prime Trading suffered a net loss in excess of approximately $53,937.50 from transactions in the May, July, September, and December 2015 CBOT wheat futures.

30.     Wheat futures were artificially inflated and options prices were similarly artificial because of Defendants' conduct. Lansing had canceled 316 wheat shipping certificates on March 6, 2015 and 68 wheat shipping certificates on March 10, 2015. This caused CBOT wheat futures and options to be artificially higher. Thus, when Prime Trading purchased May 2015 wheat futures on March 13, 2015, it did so at artificially high prices caused by Defendants and lost money as a result. For example, on March 13, 2015, Prime Trading was a net purchaser of 98 May 2015 wheat futures contracts and suffered a net loss of approximately $42,687.50 from those trades.

31.     Defendant Lansing Trade Group, LLC is a Delaware limited liability company, with principal place of business in Overland Park, Kansas and offices and facilities all over the United States, that acts as a commodity merchandising firm, largely focused on buying, handling, storing, and selling physical grain, including wheat. During the Class Period, Lansing actively traded CBOT wheat futures and options.

32.     Defendant Cascade Commodity Consulting, LLC, was founded by Al Conway in 2007 and is based in Oregon City, Oregon. Cascade publishes a daily cash wheat newsletter that offers perspectives on prices, spreads, and derivatives (futures and options), as well as market news, weather, and global wheat supply and demand. The report has attracted the readership of traders such as hedge funds, private grain analysts, futures brokerage companies, cash brokerage companies, regional grain companies, international grain companies, flour millers, foreign procurement managers and foreign wheat exporters. During the Class Period, ████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████"

33.     Additional John Doe Defendants remain unidentified. The CFTC and CME's September 26, 2018 orders instituting fines against Flavin and Grady discussed anonymous market participants and other parties who conspired with Lansing. For example, Grady's CFTC Order states that he "was an employee of a subsidiary of [Lansing]." That subsidiary remains anonymous. It also notes that "Grady participated in a telephone call with other traders" to discuss the manipulation. Those traders remain anonymous. It also states that "Grady, while acting with others, intended to send a false or misleading signal of demand for 3 ppm Vomitoxin wheat in order to increase the value of certain wheat spread and option positions." Those "others" remain anonymous. And Flavin's CME

Notice notes that he "also contacted multiple market participants and a daily cash wheat newsletter . . . ." The identities of the Lansing subsidiary, other traders, and multiple market participants, all John Doe Defendants, all remain anonymous.

34.     Defendants are responsible for, and acted for one another with respect to, the trading and manipulation at issue. Each was an agent and/or person acting on behalf of the other Defendant.

## RELEVANT NON-PARTIES

35.     The CME is made up of four exchanges: CME, CBOT, NYMEX, and COMEX. Each exchange offers a wide range of global benchmarks across major asset classes. CME merged with the CBOT in 2007. Wheat futures are traded on the CBOT.

36.     Adam Flavin ("Flavin") was a Lansing Trader during the period of manipulation. ████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████. Flavin engaged in this conduct so that Lansing would obtain ill-gotten gains from artificial prices. On September 26, 2018, the CFTC charged Flavin and fined him $125,000 for the conduct described herein. On the same day the CME fined Flavin another $125,000 for the conduct and banned him from trading for four years.

37.     Peter Grady ("Grady") is identified in the September 26, 2018 CFTC Order as an employee and a trader employed by an unknown Lansing subsidiary (and possible John Doe Defendant) during the period of manipulation. ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████. Grady approved and orchestrated Lansing's manipulative trading strategy and described how Lansing would artificially affect futures prices. Grady engaged in this conduct so that

Lansing and its John Doe subsidiary would obtain ill-gotten gains from the artificial prices. On September 26, 2018, the CFTC charged Grady and fined him $250,000 for the conduct described herein. On the same day the CME fined Grady another $250,000 for the conduct and banned him from trading for nine months.



38.

39.

40. were acting as agents of Lansing and its anonymous subsidiary within the course and scope of their agency, and were acting with the full knowledge, permission, and consent of Lansing. Further, each of their acts was made known to, and ratified by, each other and by Lansing.

41.

42. ████████████████████████████████████████

████████████████████████████████████████████

43. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

## **OPERATIVE FACTS**

### I. **Background**

44. **Commodity Futures Contract.** A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity, like wheat, at a specified time. In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.

45. **"Long" and "Short" Futures.** CBOT wheat futures contracts represent a commitment to make (in the case of a short contract) or take (long contracts) delivery of wheat at a defined point in the future. Wheat futures contracts may be settled by delivery of the actual commodity at the conclusion of the contract. But these deliveries don't often happen. To avoid delivery, the wheat futures contract can be offset or "rolled" forward before the contract goes into its delivery cycle. These delivery cycles occur during five different contract months each calendar year: March, May, July, September, and December. For options on wheat futures, trading may be conducted in the nearby wheat futures options contract month and any succeeding months. The bilateral aspect of the futures contract is that there is a seller and a buyer—two sides, a long and a short. The "long" side is the buyer of the contract. In the rare event that the long does not offset or liquidate, the long is obligated to take delivery and pay for the commodity. The "short" side is the seller of the contract. In the rare event that the short does not enter an offsetting trade, the short is obligated to make delivery of the commodity during the delivery dates.

46.     **Offset by Trading.** Futures market participants almost always "offset" their futures contracts before the expiration month when deliveries occur. For example, a purchaser of one wheat futures contract may liquidate or cancel or offset a future obligation to take delivery of wheat by selling one wheat futures contract. This sale of one contract offsets or liquidates the earlier purchase of one contract. The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

47.     **Open Interest.** Open interest is the total number of futures contracts in a delivery month that have been entered into and not yet liquidated by an offsetting transaction or fulfilled by delivery.

48.      **Volume.** Volume is the number of contracts traded during a specific period of time.

49.     Trading in CBOT wheat futures and options is subject to the rules and regulations of the CBOT, including Chapter 14 (Wheat Futures) of the CBOT Rulebook.[11] Chapter 14 of the CBOT Rulebook sets forth the details for deliveries on CBOT wheat futures contracts, including, for example, wheat grade differentials, location differentials, and delivery points.

50.     CBOT wheat futures and options are transacted electronically on the CME's Globex electronic trading platform and, in the case of options, also through "open outcry" on the trading floor of the CBOT. Open outcry is a method of public auction for making bids and offers in the trading pits of futures exchanges.

51.     Prices of CBOT wheat futures contracts are quoted in cents per bushel. The contract size for a CBOT wheat futures contract is 5,000 bushels, or about 136 metric tons.

52.     CBOT wheat options contracts are the same size as one CBOT wheat futures contract.

---

[11] *Available at* http://www.cmegroup.com/rulebook/CBOT/II/14/14.pdf.

53.     The "tick size" or minimum price fluctuation for trading wheat futures is ¼ cent per bushel, which is equivalent to $12.50 per futures contract, including spreads.

54.     CBOT wheat futures contracts are traded for delivery during five different contract months each calendar year: March (H), May (K), July (N), September (U), and December (Z). The last trade date for a particular CBOT wheat futures contract is the business day before the 15th calendar day of the contract month.

55.     CBOT wheat futures contracts are settled by physical delivery. The last delivery date is the second business day after the last trading day of the delivery month.

56.     The CBOT reports the total number of shipping certificates registered as of 4:00 p.m. on each trading day. The report is posted on the CBOT's website. The shipping certificates are marked as either 2 ppm Vomitoxin, or 3 ppm Vomitoxin.

57.     Every aspect of a futures contract traded on the CBOT, like the grade and amount of wheat, is standardized—except the price and delivery month. This standardization of futures contracts is specifically designed to facilitate the ease of trading of fungible contracts in one central market place. Furthermore, the delivery date is standardized within a particular contract month. For example, all March wheat futures contracts require delivery at the beginning of April.

58.     **Spreads.** A spread refers to the price differential between any two items. For example, "spreads" often refer to price differences between futures contracts on the same commodity but with different expirations. For example, a spread could consist of the simultaneous purchase of a May wheat futures contract and the sale of a September wheat futures contract, in which the term "spread" would describe the difference between the purchase price and the sale price of the two contract month components. "Spreads" can also refer to the difference between the physical or "cash" commodity market price and the futures market price.

59. Usually in a "spread position," the trader is long or short a futures contract for one delivery month and the opposite for another delivery month. For example, a person could be short the May 2015 wheat futures contract and long the July 2015 wheat futures contract, which would be called a spread position or a "calendar spread" position.

60. **"Canceling for Load Out."** CBOT wheat futures contracts are physically delivered upon expiration. The delivery instrument on the wheat futures contract is a called a shipping certificate ("Shipping Certificate" in the context of this Complaint) and only warehouses approved by the exchange can register and deliver these certificates. The owner of a shipping certificate has several options: Shipping certificates can be bought and sold between traders or exchanged for futures positions, so the owner can transfer and sell the certificate to another market participant. The owner could also hold the certificate and pay storage fees. Or the owner could "cancel" the shipping certificate and order that the physical grain be "loaded-out" for transport. This is known as "canceling for load-out," and it is the mechanism Lansing used to manipulate the market after purchasing the shipping certificates at issue in this case. Canceling a shipping certificate for load-out signals to other market participants that there is immediate demand for the wheat—read: somebody wanted the wheat taken out of storage. Increased demand for wheat drives up prices, including the value of CBOT wheat futures and call options.

61. **Options Contract**. An options contract is an agreement that gives the buyer, or "option holder," the right, but not the obligation, to either buy or sell something at a specified price during a specified time period. The buyer of an option pays an "option premium" to the seller for the right to buy (call) or sell (put) the underlying commodity (in this case, wheat futures contracts).

62. "**Call options**" confer upon the buyer the right, but not the obligation, to buy the commodity at the specified price (the "strike" price). Call options confer upon the seller, or "option writer" the obligation to sell the commodity at the strike price. The buyer (person that is "long" or

"option holder") of one call option wants the value of the underlying commodity to increase so that the buyer can exercise the option at a price of less than the underlying commodity is worth and make a profit. The seller (person that is "short") a call option wants to avoid having to sell the underlying commodity at a price below market value. Therefore, the trader that is short an option would prefer the value of the underlying commodity decrease. For contracts that are "out of the money" the trader that is short a call option does not have to sell the underlying future commodity if the underlying price does not increase to the point that the value of the contract becomes worth exercising for the option holder.

63.     "**Put options**" confer upon the buyer the right, but not the obligation, to sell the underlying commodity at the strike price, and they confer upon the seller the obligation to buy the underlying commodity at the strike price. The buyer of one put contract, assuming no offsetting hedges, wants the value of the underlying commodity to decrease so that the buyer can sell the commodity at above a market price. Conversely, the seller (short) option trader wants the price of the underlying wheat futures commodity to stay above the strike price so that the seller of the option would not be forced to buy the underlying wheat futures at an above-market price.

## II.     <u>Substantive Allegations</u>

### A.  Lansing's Premeditated, Manipulative Scheme

64.     Beginning on or before February 3, 2015, Lansing traders exhibited an understanding that, given Lansing's prowess as a dominant market participant in the cash wheat market, it could use "cash [as] the tool"[12] to benefit its trading positions in wheat futures and options.

65.     On a February 3, 2015 telephone call, ███ (Lansing) agreed with ████████████ statement that the physical or "cash" wheat market plays an important role manipulating the spreads

---

[12] Lansing CFTC Order at 4.

on wheat futures and options: "[M]aking money on the cash is immaterial. You make the money on the spread . . . Cash is just, you know, the cash is the tool, the risk of the tool you had to use to make the play on the spread."[13]

66.     Heading into March 2015, Lansing held 134 shipping certificates.

67.     On March 3, 2015, Lansing traders received advance information that another market participant was planning to register and tender for delivery a "large number" of shipping certificates. This registration would signal to the market that there was a lack of demand (and presence of supply) for the wheat, and the price of the futures contracts would therefore drop.

68.     Over the next few days, armed with this information, Lansing embarked on a pre-meditated (as evidenced by the February 3, 2015 telephone conversation), manipulative strategy whereby Lansing's (and its subsidiary's) traders would take advantage of the depressed futures market prices resulting from the other market participant's tendering of the shipping certificates, increase their long May 2015/July 2015, July 2015/September 2015, and September 2015/December 2015 wheat futures spread positions ("long futures positions") as well as their May 2015 and July 2015 wheat options positions ("wheat options positions") on the cheap. Next, Lansing would purchase the 250 shipping certificates tendered by the wheat market participant. Next, Lansing would cancel the 384 shipping certificates for load-out to send false and misleading signals into the market that it was taking delivery of the wheat and, therefore, that there was demand for (and a lack of supply of) the wheat. By doing this, and making sure the market was aware of it, Lansing would falsely signal to the market that somebody wanted this wheat immediately, which would manipulate the price of the wheat futures higher and create artificial prices in the options it had just bought—and illicit profits for Defendants.

---

[13] Lansing CFTC Order at 4.

### B. Lansing Executed the Strategy

69.     Just as Lansing expected, late in the day on March 3, 2015, a market participant registered and tendered 250 shipping certificates (1.25 million bushels of wheat) with 3 ppm Vomitoxin.

70.     Given the market's perception of a lack of demand for 3 ppm Vomitoxin wheat, based on the 250 shipping certificates that had been registered and tendered for delivery, the price of wheat futures began decreasing. Lansing's began increasing its long futures and related options positions. In a March 4 email exchange, Grady told Flavin that he "think[s] there is an excellent revenue play for the group that can lift and execute the 250 receipts."[14]

71.     Then, Lansing began to execute. In a communication on March 5, Grady asked Flavin: "can you buy [the] receipts?" Flavin replied: "yes, I am buying them." After the purchase, Lansing held 100% of the CBOT registered shipping certificates. Lansing did this to manipulate the futures market.

72.     Lansing knew that by canceling the 384 shipping certificates for load-out, it would signal artificial demand and increase the value of its acquired long wheat futures and options positions. Lansing traders communicated amongst each other and with other market participant co-conspirators on recorded telephone lines, demonstrating their understanding that the perception of increased market demand and a lack of supply deliverable against the futures contract.

73.     The Lansing traders understood that the perception of increased market demand would result in an increased value of Lansing's own long wheat futures and related wheat options positions. Grady told Flavin on that day that he had 2000 long May futures and 4000 long July futures.

---

[14] Grady CFTC Order at 5.

This long position primed Lansing to benefit from an artificially inflated wheat market that Defendants caused.[15]

74. During this same time of registering shipping certificates, from March 3 to 6, Lansing acquired or added to its long futures and related options positions, which would benefit from the planned cancelation of the certificates. Lansing knew that when it canceled the certificates, the futures prices would increase, and thus affect options contracts as well.

75. In a March 5, 2015 telephone call, for example, ███████████████████ ████████████████ discussed the effect that canceling and loading-out the shipping certificates would have on the price curve:

**March 5, 2015**:[16]

| | |
|---|---|
| ████████ | What do you think it does if someone can use it [the 3-vomitoxin wheat]? |
| ████████ | Say that again? |
| ████████ | What do you think it does to the curve [the price of the spread] if it gets cancelled? |
| ████████ | If somebody takes them? |
| ████████ | Yeah. |
| ████████ | Yeah, uh, boy, I think it has big ramifications. You've just traded everybody out of their position, and you've done it on the premise that you have a poisoned well. |

76. In another March 5, 2015 telephone call, ████ discussed with ████, how canceling the certificates would manipulate the price curve in the futures market, and that Lansing management approved the scheme:

---

[15] Grady CFTC Order at 5.

[16] Lansing CFTC Order at 4-5.

**March 5, 2015**:[17]



|  | I think we just need to figure out what our endgame here is. I went and talked to ██████ and he was in support of it. Just, you know, what ultimately do we want to do here? What are your thoughts? |
|  | I think we ultimately want to go through and execute this. |
|  | How much do you think this shifts the curve? . . . Do you think this moves the curve seven cents if it was cancelled and executed? |
|  | Yeah, I think you can see May-July get back to 2 to 3 cent carry July-Sept probably gets back to six cents, seven cents. |

77.      ████████████████████████████████████████████

████████████████████████████████. These March 5, 2015 communications (the same day Lansing began its purchasing of the 250 shipping certificates) showcase Lansing's knowledge and intent that by purchasing the shipping certificates and then canceling them for load-out, it would send false and misleading signals into the marketplace that would lead other market participants to believe there was demand for (and lack of supply of) the wheat, which would have the result of shifting the curve (pricing spread) of its traders own long wheat futures and options positions. The market had no way to know at the time that those signals were false.

78.      As set forth in the CME September 26, 2018 Notices of Disciplinary Action, Flavin and Grady engaged in this conduct "to influence the market to benefit [Lansing's] futures and options positions."[18]

---

[17] ████████████████████████████████████████████.
This conversation was also in Lansing CFTC Order at 5.

[18] See CME Notice of Disciplinary Action, CBOT-15-0160-BC-2, September 26, 2018. *Available at* https://www.cmegroup.com/notices/disciplinary/2018/09/cbot-15-0160-bc-2-adam-flavin.html#pageNumber=1 (Flavin). And CME Notice of Disciplinary Action, CBOT-15-0160-BC-3, September 26, 2018. *Available at* https://www.cmegroup.com/notices/disciplinary/2018/09/cbot-15-0160-bc-3-peter-grady.html#pageNumber=1 (Grady).

79. On March 6, Grady and Flavin discussed their plan to cancel the wheat certificates that day:

**March 6, 2015**[19]

Adam Flavin:     We're gonna execute it … and I think we can just catch this sucker off-guard. I'm one phone call away from … to cancel every Chicago receipt as well.

Peter Grady:     That'd be awesome. …

*          *          *

Adam Flavin:     **I think it will send a very potent signal if we did it all in one day [cancel the Wheat Certificates] . . . I think it will send a potent signal**. (emphasis added).

80. ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████ agreed to Flavin's request to promulgate misinformation about increased demand and the intent of the big holder of the shipping certificates to cancel and load out the shipping certificates.

████████████████████████████████████████████████████.

81. ██████████████████████████████████████

████████████████████████████████████████

██████████          ██████████████████████████

██████          ██████████████████

██████          ██████████████████

██████          ████████████████

———————————
[19] Grady CFTC Order at 5.



85. 

86.

87.     Flavin and Grady appreciated that if they could continue to falsely signal to the market that the big cancelation was from a market participant that truly had a demand for the wheat, prices would get even more lopsided. Later in the day on March 6, Grady spoke on the phone with other traders,[29] suggesting that they keep up appearances: "I think the important thing is just to get transportation in Chicago and get that s\*\*t moving. Because what's gonna be more impressive is when they start seeing things move. . . . and if I need to donate something to the funds, I'll gladly go through and do that."[30]   That's consistent with what Grady said from the start: on March 4, Grady e-mailed another anonymous Lansing employee saying: "I will help pay for some of this if we can execute the delivery wheat, . . . as a company I feel there is great potential in this."[31]

88.     Lansing's cancelation created a rush in the market ███████████████ , once the market perceived an unexpected demand for (and lack of supply) for registered wheat. On March 6, 2015, Lansing canceled 316 of its shipping certificates. The cancelations are reflected in the registrations at the Sunrise Cooperative Inc. Warehouse dropping from 134 to 0 and the CIRM warehouse registrations dropping from 250 to 68. On March 10, 2015, Lansing canceled the remaining 68 shipping certificates at the CIRM warehouse. These cancelations are reflected in the chart below,

---

[29] The identities of these traders remain unknown to Plaintiffs.
[30] Grady CFTC Order at 6.
[31] Grady CFTC Order at 5.

which shows the reduction in the number of shipping certificates registered by CME on March 6, 2015 and March 10, 2015.

**Wheat Futures Shipping Certificates**

| Date | Warehouse Name | Warehouse Location | Number Registered 4:00 p.m. | Total Cancelation |
|------|----------------|--------------------|-----------------------------|-------------------|
| 3/2/2015 | CIRM | Chicago, IL | 0 | N/A |
| 3/2/2015 | Sunrise Cooperative Inc. | Clyde, Ohio | 134 | N/A |
| 3/3/2015 | CIRM | Chicago, IL | 250 | N/A |
| 3/3/2015 | Sunrise Cooperative Inc. | Clyde, Ohio | 134 | N/A |
| 3/4/2015 | CIRM | Chicago, IL | 250 | N/A |
| 3/4/2015 | Sunrise Cooperative Inc. | Clyde, Ohio | 134 | N/A |
| 3/5/2015 | CIRM | Chicago, IL | **250** | N/A |
| 3/5/2015 | Sunrise Cooperative Inc. | Clyde, Ohio | **134** | N/A |
| 3/6/2015 | CIRM | Chicago, IL | **68** | 182 |
| 3/6/2015 | Sunrise Cooperative Inc. | Clyde, Ohio | **0** | 134 |
| 3/9/2015 | CIRM | Chicago, IL | **68** | 182 |
| 3/9/2015 | Sunrise Cooperative Inc. | Clyde, Ohio | 0 | 134 |
| 3/10/2015 | CIRM | Chicago, IL | 0 | 250 |
| 3/10/2015 | Sunrise Cooperative Inc. | Clyde, Ohio | 0 | 134 |
| 3/11/2015 | CIRM | Chicago, IL | 0 | 250 |
| 3/11/2015 | Sunrise Cooperative Inc. | Clyde, Ohio | 0 | 134 |

89.     The result of these cancelations was that, just prior to the expiration of the March 2015 wheat futures contract, there were no remaining shipping certificates available for trade in the market. Because a short position holder must be prepared to deliver the underlying commodity, and the delivery instrument includes shipping certificates, the cancelations and the absence of any registrations would have an upward effect on prices—in this case an artificial upward effect because Lansing's acquisition and subsequent cancelation of the certificates was manipulative by design.

**C.      Price Movements during the Relevant Period**

90.     Prices fell after March 3, 2015 (when the 250 shipping certificates were registered by the other market participant), began to artificially increase on March 6, 2015 (by which time Lansing

had primed the market for its cancelation by having ████████████ claiming that the purchaser of the certificates would be canceling them for load out because it needed the wheat), artificially increased dramatically on March 9, 2015 (the first trading day after Lansing canceled 316 certificates), and artificially increased even more on March 11, 2015 (the first trading day after Lansing canceled the remaining 68 certificates). These are reflected in the tables and charts below.

91.     After the registration of the 250 shipping certificates, the "spot" (physical) wheat price during the time dropped from $5.06 to $4.80 from March 3 to March 5, as the registration of the Certificates signaled a lack of demand for wheat. When Lansing canceled the certificates, prices artificially increased throughout the next week, reaching $5.14 by March 16. Lansing's manipulation proximately caused the wheat prices to artificially increase, as the cancelation of the certificates sent a false signal of demand for wheat to the market.

92.     The futures prices moved in tandem with the spot prices. As with the spot prices, the futures prices decreased on March 4 (the first trading day after the other market participant registered the 250 Wheat Certificates on March 3), artificially increased on March 6, 2015 (by which time Lansing had begun to prime the market for its intended cancelation), increased dramatically on March 9, 2015 (the first trading day after Lansing had canceled the 316 certificates), and artificially increased even more on March 11, 2015 (the first trading day after Lansing canceled the remaining 68 certificates). At the end of March 3, 2015, when the 250 shipping certificates were registered, prices rapidly fell from approximately $5.05 to below $4.94 per bushel and then continued to fall to approximately $4.80 per bushel as the market incorporated the news of excess supply and weak demand for the wheat. Shortly after the end of trading on Friday, March 6, 2015, when news of trading on Monday Lansing's first large cancelation of shipping certificates hit the news and before the opening of, March 9, 2015, prices artificially increased from approximately $4.82 to $4.85. They continued to artificially rise as the

markets absorbed the first and second waves of Lansing's manipulative cancelations and the absence of available supply of wheat in the form of registered shipping certificates.

93.     The chart below reflects the March 2015 and May 2015 futures closing price during the period March 2, 2015 through March 13, 2015. As the chart demonstrates, prices decreased after the other market participant registered the 250 shipping certificates after the close of trading on March 3, 2015, artificially increased on March 6, 2015 (by which time Lansing had primed the market for its cancelation), artificially increased further on March 9, 2015 (the first day of trading after Lansing canceled 316 certificates), and artificially increased further still after March 11 (the first day of trading after Lansing canceled the remaining 68 certificates).

| Date | March Futures Closing Price | May Futures Closing Price |
|------|-----------------------------|---------------------------|
| 3/2/2015 | 508.00 | 500.00 |
| 3/3/2015 | 508.75 | 506.00 |
| 3/4/2015 | 493.50 | 496.00 |
| 3/5/2015 | 481.25 | 480.50 |
| 3/6/2015 | 485.75 | 482.50 |
| 3/9/2015 | 494.25 | 490.00 |
| 3/10/2015 | 496.50 | 493.25 |
| 3/11/2015 | 503.00 | 499.00 |
| 3/12/2015 | 513.25 | 507.25 |
| 3/13/2015 | 508.75 | 502.00 |

94.     The graph below reflects March and May 2015 wheat futures prices during the relevant period and in surrounding weeks. The artificial price movements caused Lansing described above were reflected in both March and May futures prices which, as shown below, tend to move in tandem due to their highly correlated nature.



95.     The graph below reflects March, May, July, September and December 2015 futures prices as well as March 2016 futures prices. The prices correspond: Lansing's manipulation in March 2015 caused price artificiality across instruments:



In particular, prices declined across all futures after March 3, 2015 when the 250 shipping certificates were registered. They artificially increased following each of Lansing's manipulative shipping certificate cancelations on March 6 and 10, 2015.

## CLASS ACTION ALLEGATIONS

96.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and as a representative of the following Class:

All persons or entities (other than Defendants and any parent, subsidiary, affiliate, or agent of any Defendant) that transacted in CBOT wheat futures or options contracts during the period February 1, 2015 through March 31, 2015 (the "Class Period").[32]

97.     The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that at least thousands of geographically dispersed Class members transacted in CBOT wheat futures and options contracts during the Class Period.

98.     Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

99.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are adequate representatives of the Class and have no interests which are adverse to the interests of absent Class members. Plaintiffs have retained counsel competent and experienced in class action litigation, including commodity manipulation class action litigation.

100.    Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. These common questions of law and facts include, without limitation:

(a)  Whether Defendants manipulated CBOT wheat futures and options contracts in violation of the CEA;

(b)  Whether such manipulation by Defendants caused prices of CBOT wheat futures and options contracts to be artificial;

(c)  Whether such manipulation by Defendants caused cognizable legal injury under the CEA;

(d)  Whether Defendants' unlawful acts violate Section 1 of the Sherman Antitrust Act;

---

[32] Plaintiffs have defined the Class based on currently available information and reserve the right to amend or expand the definition of the Class, including, without limitation, the Class Period and contracts at issue.

(e) The operative time period and extent of Defendants' foregoing violations;

(f) Whether such injury or the fact or extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests; and

(g) The appropriate measure of damages suffered by the Class.

101. A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class action will permit a "large number" of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

102. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

103. By its very nature, the unlawful activity alleged herein that Defendants engaged in was self-concealing.

104. Plaintiffs and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until it became public on July 12, 2018, after the entry of the CFTC's Order.

105. Because Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiffs and the proposed Class could not have

discovered the existence of this unlawful conduct any earlier than its public disclosure on July 12, 2018. In fact, the whole point—for the manipulation to be effective—was that no one outside the conspiracy would know Defendants' true plans. The conspiracy's communications at the time confirmed that they were concealing the scheme, and they thought they were succeeding: █████

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████ ██.[33]

106. Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs or members of the Class has been tolled during the period of such fraudulent concealment.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (For Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* and Regulation 180.2)

#### Against all Defendants

107. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

108. Defendants, through their acts alleged herein, specifically intended to and did cause unlawful and artificial prices of CBOT wheat futures and options during the Class Period.

109. As alleged herein, Defendants had the ability to cause and did cause artificial prices. Defendants' trading and other activities alleged herein constitute market power manipulation of the

---

[33] ███████████████████████████████████████████████████████████████████
██████████

prices of CBOT wheat futures and options in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

110.     As alleged herein, Defendants manipulated the price of a commodity in interstate commerce or for future delivery on or subject to the rules of any registered entity, in violation of the CEA.

111.     Defendants' foregoing extensive manipulative conduct deprived Plaintiffs and other traders of a lawfully operating market during the Class Period.

112.     Plaintiffs and others who transacted in CBOT wheat futures and options during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the CEA, 7 U.S.C. §§ 1, *et seq.*, and as a direct result thereof were injured and suffered damages.

113.     Plaintiffs and members of the Class are each entitled to actual damages sustained in CBOT wheat futures and options contracts for the violations of the CEA alleged herein.

<u>**SECOND CLAIM FOR RELIEF**</u>

**(For Employing a Manipulative and Deceptive Device in Violation of the Commodity Exchange Act,
7 U.S.C. §§ 1, *et seq.* and Regulation 180.1(a))**

**Against all Defendants**

114.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

115.     Defendants intended to affect or acted recklessly with regards to affecting prices of CBOT wheat futures and options contracts and engaged in overt acts in furtherance of that intent.

116.     As alleged herein, Defendants intentionally or recklessly used or employed a manipulative device or artifice to defraud and engaged in any act, practice or course of business which operated or would operate as a fraud or deceit upon any person, in violation of Section 6(c)(1) of the

CEA (7 U.S.C. § 9), and Section 22 of the CEA (7 U.S.C. § 25), and Regulation 180.1(a), 17 C.F.R. § 180.1(a).

117.    Defendants' conduct proximately caused injury to Plaintiff and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices during the Class Period.

118.    Plaintiffs and members of the Class are each entitled to actual damages sustained in CBOT wheat futures and options contracts for the violations of the CEA alleged herein.

### THIRD CLAIM FOR RELIEF

**(For Principal-Agent Liability in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* and Regulation 1.2)**

**Against all Defendants**

119.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

120.    Lansing's traders, employees and/or officers were each an agent and/or other person on behalf of the Defendants.

121.    This included when Defendants, through their employees, agents and/or others directed, developed, executed and otherwise acted with respect the scheme, artifice, or manipulative device alleged herein.

122.    Defendants are liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) and Regulation 1.2, 17C.F.R. § 1.2 (2014), for the manipulative acts of its agents, representatives, and/or other persons acting for them in the scope of their employment.

123.    Plaintiffs and members of the Class are each entitled to actual damages sustained in CBOT wheat futures and options contracts for the violations of the CEA alleged herein.

## FOURTH CLAIM FOR RELIEF

**(For Aiding and Abetting Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)**

### Against all Defendants

124.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

125.    Defendants knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein. Defendants did so knowing of their manipulation of CBOT wheat futures and options prices, and willfully intended to assist these manipulations, which resulted in CBOT wheat futures and options to reach artificial prices, during the Class Period in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

126.    Plaintiffs and members of the Class are each entitled to actual damages sustained in CBOT wheat futures and options for the violations of the CEA alleged herein.

## FIFTH CLAIM FOR RELIEF

### (Unjust Enrichment and Restitution/Disgorgement)

### Against all Defendants

127.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

128.    Defendants financially benefited from their unlawful acts.

129.    These unlawful acts caused Plaintiffs and other members of the Class to suffer injury, lose money, and transact in CBOT wheat futures and options at artificial prices.

130.    In addition to being unlawful, Defendants' acts are also unfair and inequitable. It is thus unjust and inequitable for Defendants to have unjustly enriched themselves and now retain the benefits from manipulating CBOT wheat futures and options.

131.    As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner.

132.    Each Defendant should pay its own unjust enrichment to Plaintiffs and members of the Class.

133.    Plaintiffs and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## SIXTH CLAIM FOR RELIEF

### (For Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1)

### Against all Defendants

134.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

135.    Defendants entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*

136.    During the Class Period, Defendants entered into a series of agreements designed to illegitimately profit by manipulating the prices of CBOT wheat futures and options. Lansing's traders simultaneously employed multiple manipulative tactics to this end, including (a) increasing their long May 2015/July 2015; July 2015/September 2015; and September 2015/December 2015 wheat spread positions ("long wheat spread positions"); (b) increasing their May 2015 and July 2015 wheat options positions ("wheat option positions"); (c) purchasing shipping certificates with the 3 ppm Vomitoxin wheat at a 20-cent-per-bushel discount pursuant to CBOT Rule 14104; (d) sending false and misleading signals into the market for demand of the 3 ppm Vomitoxin by canceling the shipping certificates for load-out and delivery to influence the price of the wheat futures and options being

37

traded on the CBOT; and (e) increasing the value of Lansing's long wheat futures and related wheat options positions;

137. This conspiracy to manipulate CBOT wheat futures and options restrained trade by fixing the prices of CBOT wheat futures and options at artificial levels that did not accurately reflect market demand for prices of shipping certificates in the physical or cash wheat market, instead of the prices that would have been set by competitive market forces.

138. Defendants' conduct caused injury to Plaintiffs and members of the Class who transacted in CBOT wheat futures contracts and options at artificial prices compared to what they would have otherwise paid in a competitive market.

139. The conspiracy is a *per se* violation of § 1 of the Sherman Antitrust Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the CBOT wheat futures and options contract market. There is no legitimate business justification for, or pro-competitive benefits caused by, Defendants' conspiracy and overt acts taken in furtherance thereof. Any ostensible procompetitive benefits are pretextual or could have been achieved by less restrictive means.

140. As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Antitrust Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

141. Plaintiffs and members of the Class are each entitled to seek treble damages sustained in CBOT wheat futures and options contracts for Defendants' violations of § 1 of the Sherman Antitrust Act under § 4 of the Clayton Act alleged herein.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs demand relief as follows:

A. For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiffs as Class representatives, and

Cafferty Clobes Meriwether & Sprengel LLP and Lowey Dannenberg, P.C. be appointed as co-lead Class counsel;

B.      For a judgment awarding Plaintiffs and the Class actual damages against Defendants for its violations of the CEA, as well as exemplary damages together with prejudgment interest at the maximum rate allowable by law;

C.      For a judgment awarding Plaintiffs and the Class damages against Defendants for violations of the Section 1 of the Sherman Antitrust Act, including treble damages, with prejudgment interest at the maximum rate allowable by law;

D.      For a judgment awarding Plaintiffs and the Class any and all sums of Defendants' unjust enrichment;

E.      For an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiffs and the Class;

F.      For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

G.      For such injunctive and declaratory relief, and such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully demand a trial by jury of all issues so triable.

October 1, 2018                              Respectfully submitted,


                                            _s/_____Anthony F. Fata_____
                                            **CAFFERTY CLOBES MERIWETHER &**
                                                    **SPRENGEL LLP**
                                            Anthony F. Fata
                                            Jennifer W. Sprengel
                                            Brian P. O'Connell
                                            150 S. Wacker Drive, Suite 3000
                                            Chicago, Illinois 60606
                                            Tel.: 312-782-4880



                                            **LOWEY DANNENBERG, P.C**
                                            Vincent Briganti
                                            Geoffrey M. Horn
                                            Raymond Girnys
                                            Lee J. Lefkowitz
                                            44 South Broadway
                                            White Plains, New York 10601
                                            Tel.: 914-997-0500

                                            *Counsel for Plaintiffs and the Proposed Class*


                                            **DAVIS & BUTERMAN, LLC**
                                            Michael Davis
                                            Thomas F. Cashman
                                            Carla E. Buterman
                                            53 W. Jackson, Suite 1128
                                            Chicago, Il 60604
                                            Tel.: (312) 802-3434

                                            *Additional Plaintiffs' Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I, Anthony F. Fata, an attorney, hereby certify that on October 1, 2018, service of the foregoing ***Amended Class Action Complaint*** was accomplished pursuant to ECF as to Filing Users and I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.

*s/   Anthony F. Fata*
Anthony F. Fata
