# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| BUDICAK, INC., BLUE MARLIN ARBITRAGE, LLC, and PRIME TRADING, LLC, on behalf of themselves and all others similarly situated, | ) ) ) ) | Case No. 18 C 4966 |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) | Judge Edmond E. Chang |
| v. | ) |  |
|  | ) |  |
| LANSING TRADE GROUP, LLC, CASCADE COMMODITY CONSULTING, LLC, and JOHN DOES NOS. 6-10, | ) ) ) | |
|  | ) |  |
| Defendants. | ) |  |

**DEFENDANT LANSING TRADE GROUP'S
MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE AND
<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 3

I.   Factual Background. ................................................................................................ 3

II.  Allegations Regarding CFTC Proceedings. ........................................................... 5

LEGAL STANDARDS ...................................................................................................... 6

ARGUMENT ..................................................................................................................... 8

I.   Plaintiffs Fail To Allege Injury-In-Fact Sufficient To Establish Article III
     Standing. ................................................................................................................. 8

II.  Counts I And II Fail Because They Depend Upon A Supposed "False Signal"
     That The Complaint Does Not Allege Was False. ................................................ 12

III. Plaintiffs Do Not State A Claim For Principal-Agent Liability (Count III) Or
     Aiding And Abetting (Count IV). .......................................................................... 17

IV.  The Antitrust Claim (Count VI) Fails For Lack Of An Unlawful Agreement,
     Market Power, Or Anticompetitive Effects. ......................................................... 17

     A.   Plaintiffs Fail to Allege a *Per Se* Violation of Section 1. .................... 17

     B.   Plaintiffs Do Not Allege the Existence of an Unlawful Agreement to
          Restrain Trade. ........................................................................................ 20

     C.   Plaintiffs Fail to Allege Market Power. .................................................. 21

     D.   Plaintiffs Fail to Allege Any Anticompetitive Effects. ........................... 23

V.   The Amended Complaint Fails To State A Claim For Unjust Enrichment (Count
     V). .......................................................................................................................... 24

VI.  The Court Should Strike All Allegations Extending The Proposed Class Period
     Prior To March 6, 2015. ........................................................................................ 25

CONCLUSION ................................................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Apex Digital* v. *Sears, Roebuck & Co.*,
    572 F.3d 440 (7th Cir. 2009) ....................................................................................6

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)................................................................................................7

*Ass'n Benefit Servs., Inc.* v. *Caremark Rx, Inc.*,
    493 F.3d 841 (7th Cir. 2007) ..................................................................................25

*ATSI Commc'ns, Inc.* v. *Shaar Fund., Ltd.*,
    493 F.3d 87 (2d Cir. 2007)................................................................................7, 16

*Ball Mem. Hosp., Inc.* v. *Mutual Hosp. Ins., Inc.*,
    784 F.2d 1325 (7th Cir. 1986) ................................................................................22

*Banks* v. *National Collegiate Athletic Ass'n*,
    977 F.2d 1081 (7th Cir. 1992) ................................................................................23

*Basic Inc.* v. *Levinson*,
    485 U.S. 224 (1988)................................................................................................17

*Bel Canto Design, Ltd.* v. *MSS HiFi, Inc.*,
    No. 11 C 6353, 2012 WL 2376466 (S.D.N.Y. June 20, 2012)...............................19

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007).................................................................................7, 9, 19, 25

*Blue Cross & Blue Shield United* v. *Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ..................................................................................24

*Brown* v. *Medtronic, Inc.*,
    628 F.3d 451 (8th Cir. 2010) ....................................................................................8

*Brownmark Films, LLC* v. *Comedy Partners*,
    682 F.3d 687 (7th Cir. 2012) ..................................................................................14

*Bunker Ramo Corp.* v. *United Business Forms, Inc.*,
    713 F.2d 1272 (7th Cir. 1983) ............................................................................18, 19

*Car Carriers, Inc.* v. *Ford Motor Co.*,
    745 F.2d 1101 (7th Cir. 1984) ................................................................................24

*Caribbean Broad. Sys., Ltd.* v. *Cable & Wireless P.L.C.*,
    148 F.3d 1080 (D.C. Cir. 1998) .............................................................................21

*CFTC* v. *Kraft Foods Grp., Inc.*,
    153 F. Supp. 3d 996 (N.D. Ill. 2015) ...........................................................12, 13

*Collier* v. *SP Plus Corp.*,
    889 F.3d 894 (7th Cir. 2018) (per curiam)...........................................................11

*Commonwealth of Penn. ex rel. Zimmerman* v. *PepsiCo, Inc.*,
    836 F.2d 173 (3d Cir. 1988).................................................................................19

*Copperweld Corp.* v. *Independence Tube Corp.*,
    467 U.S. 752 (1984)......................................................................................18, 22

*Cowen* v. *Lenny & Larry's, Inc.*,
    No. 17 C 1530, 2017 WL 4572201 (N.D. Ill. Oct. 12, 2017) ...........................25

*Dura Pharms., Inc.* v. *Broudo*,
    544 U.S. 336 (2005)...............................................................................................8

*Harry* v. *Total Gas & Power N.A., Inc.*,
    244 F. Supp. 3d 402 (S.D.N.Y. 2017)..................................................................11

*Huddleston* v. *Am. Airlines, Inc.*,
    No. 16 C 9100, 2018 WL 4742097 (N.D. Ill. Oct. 2, 2018) .................................8

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*,
    60 F. Supp. 3d 914 (N.D. Ill. 2014) ......................................................12, 17, 25

*In re Platinum & Palladium Commodities Litig.*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011)...................................................................6

*In re Rough Rice Commodity Litig.*,
    No. 11 C 618, 2012 WL 473091 (N.D. Ill. Feb. 9, 2012).................................12, 17

*In re Soybean Futures Litig.*,
    892 F. Supp. 1025 (N.D. Ill. 1995) .....................................................................17

*Klein Prods. LLC* v. *Int'l Paper Co.*,
    831 F.3d 919 (7th Cir. 2016) ...............................................................................24

*Kohen* v. *Pac. Inv. Mgmt. Co.*,
    571 F.3d 672 (7th Cir. 2009) ....................................................................8, 11, 26

*Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*,
    551 U.S. 877 (2007)..............................................................................................18

*Lerma* v. *Univision Commc'ns. Inc.*,
   52 F. Supp. 2d 1011 (E.D. Wis. 1999) ...................................................................24

*Levin* v. *Miller*,
   763 F.3d 667 (7th Cir. 2014) .............................................................................7

*Loveman* v. *Lauder*,
   484 F. Supp. 2d 259 (S.D.N.Y. 2007).....................................................................23

*Lujan* v. *Defenders of Wildlife*,
   504 U.S. 555 (1992).......................................................................................8

*Meyer* v. *Ward*,
   No. 13 C 3303, 2017 WL 1862626 (N.D. Ill. May 9, 2017) ...........................................6

*Monsanto Co.* v. *Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984)......................................................................................21

*Ohio* v. *Am. Express Co.*,
   138 S. Ct. 2274 (2018) .......................................................................18, 19, 22

*Oshana* v. *Coca-Cola Co.*,
   472 F.3d 506 (7th Cir. 2006) ...........................................................................26

*Ploss* v. *Kraft Foods Group, Inc.*,
   197 F. Supp. 3d 1037 (N.D. Ill. 2016) ..................................................................7

*Reed* v. *Palmer*,
   906 F.3d 540 (7th Cir. 2018) .......................................................................15, 23

*Retail Wholesale & Dept. Store Union Local 338 Ret. Fund* v. *Hewlett-Packard Co.*,
   52 F. Supp. 3d 961, 964 ..........................................................................15, 16

*ScripsAmerica, Inc.* v. *Ironridge Global LLC*,
   119 F. Supp. 3d 1213 (C.D. Cal. 2015) ................................................................23

*Season Comfort Corp.* v. *Ben A. Borenstein Co.*,
   655 N.E.2d 1065 (Ill. App. Ct. 1995) ...................................................................25

*Shad* v. *Dean Witter Reynolds, Inc.*,
   799 F.2d 525 (9th Cir. 1986) ..........................................................................15

*Slep-Tone Entm't Corp.* v. *Elwood Enters., Inc.*,
   165 F. Supp. 3d 705 (N.D. Ill. 2015) ..................................................................19

*Solent Freight Servs., Ltd.* v. *Alberty*,
   914 F. Supp. 2d 312 (E.D.N.Y. 2012) ..................................................................19

iv

*Spector* v. *Mondelez Int'l, Inc.*,
   No. 15 C 4298, 2017 WL 4283711 (N.D. Ill. Sept. 27, 2017), *appeal dismissed*, No. 17-3222, 2018 WL 1961100 (7th Cir. Apr. 18, 2018) ................................7, 16

*Sullivan & Long, Inc.* v. *Scattered Corp.*,
   47 F.3d 857 (7th Cir. 1995) ................................................................................17

*Super Pawn Jewelry & Loan, LLC* v. *Am. Envtl. Energy, Inc.*,
   No. 11 C 08894, 2015 WL 1777484 (N.D. Ill. Apr. 16, 2015)................................6

*Swanson* v. *Citibank, N.A.*,
   614 F.3d 400 (7th Cir. 2010) ..............................................................................18

*Taylor* v. *KeyCorp.*,
   680 F.3d 609 (6th Cir. 2012) ................................................................................8

*UNR Indus., Inc.* v. *Continental Ins. Co.*,
   607 F. Supp. 855 (N.D. Ill. 1984) .......................................................................18

*Veluchamy* v. *F.D.I.C.*,
   706 F.3d 810 (7th Cir. 2013) ................................................................................3

*W. Bend Mut. Ins. Co.* v. *Schumacher*,
   844 F.3d 670 (7th Cir. 2016) ....................................................................... passim

*Wojcik* v. *InterArch, Inc.*,
   No. 13-cv-1332, 2013 WL 5904996 (N.D. Ill. Nov. 4, 2013) ..............................19

**STATUTES**

*Antitrust Law* ¶ 782b (3d ed. 2013) .........................................................................20

Commodity Exchange Act, 7 U.S.C. § 1, *et seq.* ("CEA")...................................... passim

Sherman Antitrust Act, 15 U.S.C. § 1.................................................................... passim

**OTHER AUTHORITIES**

17 C.F.R. § 180.1(a)..............................................................................................5, 12

17 C.F.R. § 180.2 ..................................................................................................5, 12

17 C.F.R. § 1.2 ...........................................................................................................5

Fed. R. Civ. P. 8 .........................................................................................................7

Fed. R. Civ. P. 9(b) ....................................................................................................7

Fed. R. Civ. P. 11 .....................................................................................................14

Fed. R. Civ. P. 12(b)(1)..........................................................................................................6, 11

Fed. R. Civ. P. 12(b)(6).................................................................................................3, 6, 14, 15

Fed. R. Civ. P. 12(f) ...............................................................................................................8, 25

Fed. R. Civ. P. 23 .........................................................................................................................25

Fed. R. Evid. 201 ...................................................................................................................15, 23

CBOT Rule 713.D .........................................................................................................................15

CBOT Rule 14107 .........................................................................................................................15

**INTRODUCTION**

Plaintiffs allege that defendant Lansing Trade Group, Inc. ("Lansing"), a large grain merchandiser that constantly buys and sells wheat, engaged in a scheme to manipulate the CBOT wheat futures and options markets by telling the market it was planning to buy wheat, and then actually buying that wheat. They claim that Lansing, on its own and with the cooperation of newsletter publisher and defendant Cascade Commodity Consulting, LLC ("Cascade"), sent a "false signal" that Lansing would acquire physical wheat from the futures market by cancelling shipping certificates to "load out" the underlying wheat. Lansing's "announced" plan to buy this wheat sent a supposedly "false signal" of demand, which in turn artificially increased the price of CBOT wheat futures and options contracts, to Lansing's supposed financial benefit. One fundamental flaw underlies all of Plaintiffs' claims, however: the Complaint fails to allege there was anything "false" about the signal. Plaintiffs never allege that Lansing did not actually load out and obtain physical possession and ownership of wheat. The fact that Lansing's futures positions allegedly benefitted from its purchase of physical wheat is irrelevant, because there was nothing false about the signal Lansing purportedly sent. At best, Plaintiffs' claim is that Lansing established futures positions that stood to benefit from a signal of *true* demand, *i.e.*, its purchase of wheat. That is not a completed manipulation. The Complaint is fatally deficient in multiple respects and should be dismissed in its entirety.

*First*, Plaintiffs fail to allege that they suffered injury-in-fact sufficient to confer Article III standing. In a commodities case like this, Article III demands that civil plaintiffs allege that they suffered an aggregate loss across all of their trading positions during the alleged manipulation. Here, Plaintiffs allege that Lansing's conduct caused artificial prices in six CBOT wheat futures contacts, as well as related options contracts, through the date Lansing first sent

the "signal" in question (March 6, 2015), until the end of the Class Period (March 31, 2015).[1] Plaintiffs do not allege a net loss associated with all of those contracts across that entire period. Rather, Plaintiffs cherry-pick particular CBOT futures or options contracts and particular days during the period where prices were allegedly inflated and on which they may have lost money. But the Complaint itself acknowledges that each Plaintiff traded other relevant contracts during the time period that, under Plaintiffs' theory of the case, were necessarily impacted by Lansing's conduct. Plaintiffs ignore those trades entirely. Accordingly, Plaintiffs have not alleged facts which, if proven, would demonstrate what Seventh Circuit precedent and Article III demands: that they suffered a net loss on all of their positions during the alleged manipulation. This Court should therefore dismiss this case for lack of subject matter jurisdiction.

*Second*, all of Plaintiffs' claims under the Commodity Exchange Act ("CEA") fail because each is based on the premise that Lansing sent a "false signal" of demand that it would load out wheat from the futures market. Because Plaintiffs do not allege that signal was false—they never allege Lansing failed to load out wheat—all of Plaintiffs' CEA claims fail. Indeed, accepting Plaintiffs' theory that a true signal of demand can support a market manipulation claim would upend the commodities laws, which should *encourage* market participants to disclose accurate information about their positions.

*Third*, Plaintiffs' fail to allege an antitrust claim under Section 1 of the Sherman Act for multiple reasons. Plaintiffs fail to allege a *per se* violation, and otherwise fail to allege any agreement between Lansing and Cascade to insulate Lansing from competition. Plaintiffs fail to

---

[1] As discussed below, the Complaint alleges a class period from February 1 to March 31, 2015, despite alleging that Lansing's conduct did not impact prices until March 6, 2015. The Court should strike the allegation regarding that class period. If the Court does not, however, that would only exacerbate Plaintiffs' failure to allege facts establishing Article III standing because they would need to allege injury on all their trading positions back to February 1, 2015, which they do not do.

allege that Lansing has market power in any conceivable antitrust market. And Plaintiffs allege no facts showing—or even articulate a coherent theory as to how—Defendants' conduct could adversely harm competition. Indeed, as explained below, the most likely consequence of the conduct in question would be to *increase*, not *decrease*, competition. Plaintiffs' antitrust claim is implausible as pled.

*Fourth*, Plaintiffs common law unjust enrichment claim fails because it is predicated on an allegation that Lansing and Cascade enriched themselves through "unlawful acts" in violation of the CEA. Because the Complaint does not allege a violation of the CEA, the unjust enrichment claim fails.

*Fifth*, and finally, the Court should strike the allegation that the Class Period covers February 1, 2015 through March 31, 2015, because the Complaint plainly alleges that the alleged misconduct did not impact CBOT wheat futures or options prices until March 6, 2015. Purchasers from before that date cannot have been harmed by Defendants' conduct and therefore cannot be included in the proposed class.

## BACKGROUND

### I.     Factual Background.[2]

Lansing is a commodity merchandising company that purchases, handles, stores, and sells physical commodities, including grains like wheat. ¶¶ 2, 31.[3] Accordingly, and unlike a speculator, Lansing has ongoing demand to source wheat from the cash or futures markets. ¶¶ 2,

---

[2]     As required under Rule 12(b)(6), this brief assumes the truth of the Complaint's allegations solely for purposes of Lansing's motion to dismiss. *See Veluchamy* v. *F.D.I.C.*, 706 F.3d 810, 812 (7th Cir. 2013).

[3]     Citations to "¶ __" are to the Amended Class Action Complaint ("Complaint"). Dkt. No. 38.

31. In addition, Lansing hedges its commodity trading activities by buying and selling futures and options contracts. *Id.*

Cascade is a news organization that publishes information about the wheat market on a daily basis. ¶ 2. Cascade routinely offers its subscribers market intelligence on topics such as wheat supply and wheat demand, wheat prices, spreads, and derivatives. ¶¶ 2, 32. The Complaint does not allege that Cascade buys or sells wheat or wheat futures or options contracts.

The Plaintiffs are three firms—Budicak, Inc. ("Budicak"), Blue Marlin Arbitrage, LLC ("Blue Marlin"), and Prime Trading, LLC ("Prime Trading")—that speculate in CBOT wheat futures and option contracts. ¶¶ 2, 25-29.

Lansing describes the relevant factual allegations in more detail below in the discussion of Plaintiffs' CEA claims. *See* Arg. § II. below. In short, Plaintiffs allege that Lansing concocted a scheme to artificially inflate the price of CBOT wheat futures and option contracts. Lansing did so in three principal ways. *First*, prior to March 5, 2018, Lansing allegedly owned 134 wheat shipping certificates, and between March 5 and March 10, 2018, Lansing acquired 250 additional certificates, so that it held a total of 384. ¶¶ 6-7. Shipping certificates are the instruments that entitle their holder to actually obtain physical wheat from the futures market by "loading out" the wheat underlying the certificate. ¶ 4.[4] *Second*, Lansing had a newsletter writer for Cascade supposedly publish a piece of market intelligence that a market participant may cancel and load out a large quantity of wheat certificates. ¶¶ 8, 90. *Third*, Lansing cancelled its shipping

---

[4]    "CBOT wheat futures contracts are physically delivered upon expiration. The delivery instrument on the wheat futures contract is a called a shipping certificate ("Shipping Certificate" in the context of this Complaint) and only warehouses approved by the exchange can register and deliver these certificates. The owner of a shipping certificate has several options: Shipping certificates can be bought and sold between traders or exchanged for futures positions, so the owner can transfer and sell the certificate to another market participant. The owner could also hold the certificate and pay storage fees. Or the owner could "cancel" the shipping certificate and order that the physical grain be "loaded-out" for transport." *Id.* ¶ 60.

certificates (the first step in taking physical delivering of, or "loading out," wheat from the futures market) in two batches—an initial batch of 316 wheat certificates, followed by the remaining 68 wheat certificates—on March 6 and March 10, 2015. ¶¶ 68, 86. Through those actions, Plaintiffs allege that Defendants intended to send a "false signal" of demand for wheat to the market, with the goal of causing CBOT wheat futures and option contracts to rise artificially. ¶¶ 3, 32. According to Plaintiffs, Defendants' conduct artificially inflated the prices of CBOT wheat futures and options from March 6 through March 31, 2015. ¶¶ 90-96. Nonetheless, Plaintiffs seek to represent a class of "[a]ll persons or entities . . . that transacted in CBOT wheat futures or options contracts during the period February 1, 2015 through March 31, 2015." ¶ 96.

Plaintiffs bring six claims: (1) market manipulation in violation of CEA Section 9(a)(2), 7 U.S.C. § 13(a)(2), and CFTC Regulation 180.2 (Count I); (2) employing a deceptive or manipulative device in violation of CEA Section 6(c)(1), 7 U.S.C. § 9(1), and CFTC Regulation 180.1(a) (Count II); (3) principal-agent liability under CEA Section 2(a)(1)(B), 7 U.S.C. § 2(a)(1)(B), and CFTC Regulation 1.2 (Count III); (4) aiding and abetting manipulation under CEA Section 22(a)(1), 7 U.S.C. § 25(a)(1) (Count IV); (5) common law unjust enrichment (Count V); and (6) engaging in an antitrust conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count VI). ¶¶ 107-141.

## II.    Allegations Regarding CFTC Proceedings.

The Complaint also discusses the fact that Lansing and two of its traders, Peter Grady and Adam Flavin, ("Lansing Settling Parties") settled with the Commodity Futures Trading Commission ("CFTC") and Chicago Mercantile Exchange ("CME") relating to the conduct at issue in the Complaint. ¶¶ 12-15. In the settlements, the Lansing Settling Parties resolved claims for *attempted* manipulation, and the Complaint does not allege otherwise. ¶ 12 n.10. Neither the CFTC nor the CME found that any of the Lansing Settling Parties engaged in completed

manipulation, the claims at issue in this case. Further, none of the Lansing Settling Parties admitted liability, and the Lansing CFTC order specifically noted that Lansing did not consent to use of the CFTC order, or the findings in that order, by any other party in any other proceedings. *See* Lansing CFTC Order at 1-2 n.1, *available at* https://www.cftc.gov/sites/default/files/2018-07/enflansingtradegroupllcorder071218.pdf.

The Lansing Settling Parties' CFTC and CME settlements may not be used to demonstrate that Plaintiffs have stated a claim here. *See In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593-94 (S.D.N.Y. 2011) (striking references to CFTC Order issued pursuant to settlement in resolving motion to dismiss and granting motion to dismiss after addressing balance of the complaint's allegations); *Meyer* v. *Ward*, No. 13 C 3303, 2017 WL 1862626, at *2 (N.D. Ill. May 9, 2017) (SEC Consent Decree may not be used to establish liability). Further, settlements are inherently not probative because they "may be motivated by a desire for peace rather than from any concession of weakness of position." *Super Pawn Jewelry & Loan, LLC* v. *Am. Envtl. Energy, Inc.*, No. 11 C 08894, 2015 WL 1777484, at *5 (N.D. Ill. Apr. 16, 2015) (quoting Fed. R. Evid. 408, adv. comm. notes). In assessing whether the Complaint states a claim, therefore, the Court should disregard the allegations regarding the CFTC and CME settlements. *See Platinum & Palladium*, 828 F. Supp. 2d at 593-94.

## LEGAL STANDARDS

***Subject Matter Jurisdiction.*** In assessing under Rule 12(b)(1) whether the Complaint's allegations establish Article III standing sufficient to confer subject matter jurisdiction, the Court must "look to the complaint and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Apex Digital* v. *Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009).

***Failure to State a Claim.*** To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter to state a claim for relief that is plausible on its

face. *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). Allegations that are "conclusory" are "not entitled to be assumed true," and "naked assertions devoid of further factual enhancement" and "formulaic recitation[s] of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678, 681 (quoting *Twombly*, 550 U.S. at 555). Accordingly, a court should evaluate a complaint's factual allegations only after "disregard[ing] any portions that are no more than conclusions." *W. Bend Mut. Ins. Co.* v. *Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678-79). This standard allows courts to "bypass implausible allegations" in order "to separate fantasy from claims worth litigating." *Levin* v. *Miller*, 763 F.3d 667, 671 (7th Cir. 2014). Importantly here, to plead that a statement or signal is false, a complaint must allege facts showing that the statement or signal was false—not merely a conclusory allegation of falsity. *See Spector* v. *Mondelēz Int'l, Inc.*, No. 15 C 4298, 2017 WL 4283711, at *1 (N.D. Ill. Sept. 27, 2017), *appeal dismissed*, No. 17-3222, 2018 WL 1961100 (7th Cir. Apr. 18, 2018) ("mere allegation of falsity" is "conclusory" and "not entitled to assumption of truth" under *Twombly*); *see also ATSI Commc'ns, Inc.* v. *Shaar Fund., Ltd.*, 493 F.3d 87, 100-01 (2d Cir. 2007) (market manipulation claim must be pled with particularity and allege that "a transaction sends a *false* pricing signal to the market" (emphasis added)).[5]

---

[5]    As shown below, each CEA claim sounds in fraud because each hinges on the allegation that Defendants manipulated the market through an allegedly false signal of demand. Accordingly, the Complaint must meet the heightened pleading standards under Rule 9(b) for fraud. In *Ploss* v. *Kraft Foods Group, Inc.*, this Court agreed that manipulation claims "based on explicit misrepresentations sound in fraud," but declined to decide whether manipulation claims "based on market behavior" are subject to Rule 9(b)'s heightened pleading standard. 197 F. Supp. 3d 1037, 1057 (N.D. Ill. 2016). Here, Plaintiffs base their CEA claims on alleged "explicit misrepresentations" in the form of the alleged newsletter statements by Cascade that the Complaint alleges "disseminat[ed]" Lansing's alleged "false signal" to the market. ¶¶ 41, 80, 81. Accordingly, Rule 9(b) applies under this Court's reasoning in *Ploss*. In any event, the Complaint fails even under the more relaxed pleading standard of Rule 8. *See Iqbal*, 556 U.S. at 681 (allegations that are 'conclusory' are "not entitled to be assumed true"); *Spector*, 2017 WL 4283711, at *1.

***Motion to Strike.*** A Court may strike an allegation from a complaint that is "redundant, immaterial, impertinent, or scandalous," Fed. R. Civ. P. 12(f), and a court may strike class allegations from a complaint where it is "apparent from the complaint that the class allegations are facially and inherently deficient and therefore class certification is inappropriate." *Huddleston* v. *Am. Airlines, Inc.*, No. 16 C 9100, 2018 WL 4742097, at *2 (N.D. Ill. Oct. 2, 2018) (citation omitted).

**ARGUMENT**

**I.   Plaintiffs Fail To Allege Injury-In-Fact Sufficient To Establish Article III Standing.**

To establish Article III standing, Plaintiffs must allege that Defendants' conduct caused Plaintiffs to suffer injury-in-fact. *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In a commodities case like this one, that means each Plaintiff must allege that it suffered a net loss on its aggregate positions across all the CBOT wheat futures and options contracts at issue throughout the class period. *See Kohen* v. *Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 676 (7th Cir. 2009) (holding that to demonstrate Article III standing before a class is certified, the named plaintiff must allege aggregate losses, that is, the plaintiff cannot have "made more money . . . by virtue of [an alleged manipulation] than they lost"); *cf. Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 346 (2005) (in securities fraud context, rejecting notion that an allegation that "a misrepresentation leads to an inflated purchase price" is enough to plead the required injury because it may not have "proximately cause[d] any economic loss"); *Taylor* v. *KeyCorp.*, 680 F.3d 609, 613 (6th Cir. 2012) (holding that it is "common sense" that a plaintiff has no Article III standing where they benefitted from alleged artificial inflation of market prices); *Brown* v. *Medtronic, Inc.*, 628 F.3d 451, 455 (8th Cir. 2010) ("[A]t a minimum, a plaintiff must allege a net loss in investment value that is fairly traceable to the defendants' challenged actions.").

8

Plaintiffs allege that Lansing's conduct caused artificial prices in all CBOT wheat futures or option contracts from at least March 6, 2015 (when Plaintiffs allege Lansing first sent the alleged "false signal") until March 31, 2015 (when the class period ended). ¶¶ 90-96. There are five CBOT wheat futures contract months (March, May, July, September, and December), and the Complaint alleges that Kraft's conduct impacted the prices of six separate CBOT contracts that were trading at the time of the alleged manipulation (March 2015, May 2015, July 2015, September 2015, December 2015, and March 2016). ¶¶ 45, 95. Accordingly, to adequately allege injury-in-fact, Plaintiffs must allege that they suffered a net loss in the aggregate on *all* of their positions in *both* futures and option contracts as to *all six* relevant CBOT contract months between March 6 and March 31, 2015.[6] They simply do not do this.

***Disregard conclusory allegations.*** At the outset, the Court should not credit Plaintiffs' conclusory allegations that they suffered a "net loss." ¶¶ 25, 27, 29. Those are precisely the kind of conclusory labels the Supreme Court instructed in *Twombly* do not count. *Twombly*, 550 U.S. at 555. Accordingly, the Court should disregard those allegations. *See W. Bend Mut. Ins. Co.*, 844 F.3d at 675 (holding that a court should evaluate a complaint's factual allegations only after "disregard[ing] any portions that are no more than conclusions").

***No allegations as to many relevant contracts.*** No Plaintiff alleges aggregate harm across all CBOT contract positions they held or traded. Budicak only alleges harm as to the May, July and December futures contracts, ignoring all option contracts and three of the six contract

---

[6] Below, Lansing demonstrates that the Court should strike the allegations that the Class Period extends back to February 1, 2015 because the Complaint alleges that class members could not have been injured until March 6, 2015, when the Complaint alleges the conduct first impacted prices. *See* § VI below. If the Court rejects that argument, however, that would only exacerbate Plaintiffs' failure to allege Article III standing because they would need to allege aggregate losses from February 1 to March 31, 2015, not merely from March 6-31, 2015. No Plaintiff alleges aggregate losses in the February 1-March 31, 2015 period.

months. ¶ 26. Blue Marlin only alleges harm as to the May and July futures and options contracts, ignoring four of the six contract months. ¶ 28. Prime Trading only alleges harm from May, July, September, and December futures contracts, ignoring all option contracts and two of the six contract months. ¶ 29. Further, *no* Plaintiff alleges any loss as to the *March 2015* contract (the contract Plaintiffs allege Lansing specifically targeted).

Notably, the Complaint alleges that Plaintiffs engaged in other relevant trading. Each Plaintiff alleges they transacted in *other* relevant contracts by alleging that their transactions "includ[ed]" the listed the contracts, acknowledging there were other relevant transactions. ¶¶ 25, 27, 29. Blue Marlin alleges that it made 700 trades of a variety of CBOT wheat contracts in March 2015 alone that "include[d]" trades other than those on which it asserts losses. ¶ 27. Further, the Complaint shows that Plaintiffs have attempted to hide *gains* on at least some of the relevant contracts. For example, Prime Trading alleges that it traded CBOT options contracts, but conspicuously fails to allege any *losses* on those contracts. ¶¶ 29-30. The only plausible inference from that failure is that Prime Trading made money on its option trades.[7] Yet Plaintiffs do not take into account any of those gains or other gains from trading CBOT futures or options during the Class Period.

**No allegations of losses through entire relevant time period.** The Complaint is similarly defective as to the time period of losses. The Complaint alleges a class period from February 1, 2015 until March 31, 2015, meaning the Plaintiffs must allege that CBOT wheat futures and option contracts were impacted by Defendants' supposed scheme throughout that period. ¶ 96.

---

[7]    Similarly, Blue Marlin alleges that it traded May and July 2015 futures and April, May, June and July put and call options, but (after appropriately disregarding its conclusory "net loss" allegations in ¶ 27), it only alleges a concrete *loss* of $500,000 as to the May and July futures and option contracts. ¶ 28.

Thus, Plaintiffs must allege that they suffered an aggregate loss across all impacted CBOT futures and options contracts through March 31. *See Kohen*, 571 F.3d at 676.

No Plaintiff does that. Budicak only alleges losses associated with select trades from March 10-20, 2015. ¶ 26. Blue Marlin only alleges losses from select trades from March 6-23, 2011. ¶ 28. And Prime Trading only alleges losses from select trades from March 6-13, 2011. ¶¶ 29-30.

In short, the Complaint cherry-picks particular contracts and time periods to manufacture the illusion of losses. But the Complaint never alleges the kind of loss Article III requires: aggregate losses across all CBOT futures and options contracts from at least the beginning of the supposed price effects of the alleged manipulation (March 6) (or February 1, the start of the class period) until the end of those effects (March 31, the end of the class period). *Kohen*, 571 F.3d at 676. This is no mere pleading technicality. It is entirely possible that, even if the Court accepts as true the Complaint's allegations of isolated losses during certain periods and as to certain contracts, each Plaintiff in fact *gained* in the aggregate from the conduct of which they are now complaining. Accordingly, the Complaint fails to allege the necessary injury-in-fact to show Article III standing. The Court should therefore dismiss the Complaint for lack of subject matter jurisdiction under Rule 12(b)(1). *See Collier* v. *SP Plus Corp.*, 889 F.3d 894, 895 (7th Cir. 2018) (per curiam) (lack of Article III standing "negat[es] federal subject matter jurisdiction"). And it should do so with prejudice, because Plaintiffs have already had one chance to amend their complaint and have had access to all the information they need to allege their losses since the beginning of this case. *See Harry* v. *Total Gas & Power N.A., Inc.*, 244 F. Supp. 3d 402, 416 (S.D.N.Y. 2017) (dismissing case for failure to allege actual damages when plaintiffs possessed transaction information necessary to allege economic harm).

**II.     Counts I And II Fail Because They Depend Upon A Supposed "False Signal" That The Complaint Does Not Allege Was False.**

The Complaint asserts two principal CEA claims. Count I alleges manipulation under Section 9(a) of the CEA. "To bring a claim under CEA Section 9(a) [and CFTC Regulation 180.2], a plaintiff must establish that: (1) the defendant had the ability to manipulate market prices; (2) an artificial price existed; (3) the defendant caused the artificial price to exist; and (4) the defendant specifically intended the artificial price to exist." *In re Rough Rice Commodity Litig.*, No. 11 C 618, 2012 WL 473091, at *5 (N.D. Ill. Feb. 9, 2012); *accord In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 968 (N.D. Ill. 2014). An artificial price is one that does "not reflect the underlying conditions of supply and demand." *Ploss*, 197 F. Supp. 3d at 1062 (quoting *Sullivan & Long, Inc.* v. *Scattered Corp.*, 47 F.3d 857, 862 (7th Cir. 1995)).

Count II alleges a manipulative and deceptive device in violation of Section 6(c)(1) of the CEA. Section 6(c)(1) of the CEA and CFTC Regulation 180.1(a) prohibit "intentionally or recklessly" using or attempting to use "any manipulative device, scheme, or artifice to defraud." 17 C.F.R. § 180.1(a). Modeled on Section 10(b) in the securities context, Section 6(c)(1) prohibits only fraudulent conduct associated with the purchase or sale of commodities. *CFTC* v. *Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1008 (N.D. Ill. 2015); *see also Ploss*, 197 F. Supp. 3d at 1056-57.

Counts I and II are based on the same core set of factual allegations. ¶¶ 107, 114 (incorporating same allegations as to both counts). Those core facts are: On March 3, 2015, Lansing traders learned that another market participant was planning to register and tender a large number of shipping certificates—in other words, a grain warehouse decided to sell physical wheat through the futures market. ¶ 67. That sale purportedly lowered the price of CBOT wheat

futures contracts by signaling a lack of demand for wheat. ¶¶ 67, 70. Between March 3-6, Lansing traders took advantage of those "depressed futures market prices," by increasing their long futures and options positions, all while knowing Lansing planned to buy the tendered shipping certificates and load out the underlying wheat. ¶¶ 68, 70-74. On March 5, Lansing began to buy the shipping certificates from the market participants to whom they had been delivered. ¶¶ 68, 71, 77. On March 6, Lansing canceled 316 shipping certificates for load out. ¶ 88. On March 10, Lansing canceled another 68 shipping certificates for load out. *Id.* "Cancelling for load out" is the first step in the process of actually taking physical possession of the wheat through the futures market. ¶ 60. The Complaint does not allege that any of the transactions described in this paragraph were consummated at prices other than legitimate market prices.

Plaintiffs allege that Lansing bought this wheat to send a false signal to the market. ¶¶ 9, 32, 41, 86. "Lansing knew that by canceling the 384 shipping certificates for load out, it would signal artificial demand and increase the value of its acquired long wheat futures and options positions." ¶ 72. That would benefit Lansing by causing "other market participants to believe there was demand for (and lack of supply of) the wheat, which would have the result of shifting the curve (pricing spread) of its traders own long wheat futures and options positions," to Lansing's financial benefit. ¶ 77. To amplify that supposedly false signal, Lansing traders allegedly conspired with an employee of defendant Cascade "to promulgate misinformation about increased demand and the intent of the big holder of the shipping certificates to cancel and load out the shipping certificates" through Cascade's newsletter, so as "to make the signal have as broad a reach and be as 'potent' as possible." ¶ 80. Lansing also set up the transportation

necessary to load out the wheat and transport it to Lansing's locations, which the Complaint alleges further signaled demand to the market. ¶ 87.

But the Complaint never alleges *facts* showing what was "false" about the signal Lansing purportedly sent. The Complaint never alleges that Lansing did not actually load out wheat after signaling it would. *See* ¶¶ 8, 88. Nor could the Plaintiffs allege that consistent with Rule 11.[8] The Complaint does allege in a single sentence that Lansing "had no commercial need for the wheat" it bought. ¶ 6. But the Complaint alleges *zero* facts to support that conclusory assertion, and never explains how that could be so given that (1) the Complaint also alleges that Lansing is a grain merchandiser with an ongoing business in which it constantly buys and sells "physical grain, including wheat," ¶¶ 2, 31, and (2) Plaintiffs are unable to allege that Lansing did not load out wheat. Accordingly, the unadorned assertion that Lansing "had no commercial need for the wheat"—contradicted by the Complaint's other allegations and without any concrete factual allegations to support it—should be disregarded as an improper conclusion. *W. Bend Mut. Ins. Co.*, 844 F.3d at 675.

Further, the Complaint's allegations regarding how Lansing bought the shipping certificates in question show that Lansing's conduct could not have falsely signaled demand to the market. The Complaint does not allege that Lansing had a long position in the March 2015

---

[8] The Complaint states that the basis for Plaintiffs' allegations includes, among other things, the order the CFTC issued in connection with Lansing's settlement. That settlement order makes clear that Lansing bought and loaded out wheat associated with the shipping certificates in question, showing the "signal" Plaintiffs rely upon was not false. Lansing CFTC Order at 2, 9 n.3, *available at* https://www.cftc.gov/sites/default/files/2018-07/enflansingtradegroupllcorder071218.pdf. Because Plaintiffs cited the settlement order and relied upon it in the Complaint, the Court may, if it wishes, choose to consider the factual allegations in the order described here under Rule 12(b)(6). *See Brownmark Films, LLC* v. *Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("[T]he incorporation-by-reference doctrine provides that if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment."). The Court need not consider the CFTC order to dismiss, however, because the Complaint never alleges that Lansing did not load out wheat.

futures contract, much less that Lansing obtained the shipping certificates in question by standing for delivery on that position. Rather, the Complaint alleges that on or shortly after March 5, 2015, Lansing bought 250 shipping certificates from third-parties to whom a large short delivered the certificates on March 3, 2015, in addition to the 134 certificates Lansing already owned. ¶ 6, 68, 69, 77, 88. When it bought the certificates, Lansing assumed all economic risk associated with them: it had to pay for them in full, it had to pay storage until it loaded out the wheat, it assumed the risk of transportation costs associated with taking possession of the wheat, and, of course, it assumed the risk that either the value of the certificates or the wheat underlying those certificates would fall. *See* CBOT Rule 14107 (payment for certificates due on day of delivery); CBOT Rule 713.D (buyer must pay storage fees after paying for certificate).[9] Accordingly, Lansing's conduct could not have signaled a *change* in demand to the market *at all*, because all Lansing did was purchase certificates from market participants *who already demanded them* by standing for delivery. The only thing Lansing's purchase of shipping certificates could have "signaled" was a transfer of demand from one market participant to another, which was *true* because Lansing actually bought the certificates.

Accordingly, Counts I and II both hinge on the same factual allegation: that Lansing sent a "false" signal to the market that it would load out and acquire March 2015 futures wheat,

---

[9]     Rule 713.D is available here: https://www.cmegroup.com/content/dam/cmegroup/rulebook/CBOT/I/7/7.pdf, and Rule 14107 is available here: https://www.cmegroup.com/content/dam/cmegroup/rulebook/CBOT/II/14/14.pdf (both last visited Nov. 16, 2018). The Court may consider CBOT rules in resolving the motion to dismiss because the rules are appropriate for judicial notice. *See Reed* v. *Palmer*, 906 F.3d 540, 548 (7th Cir. 2018) (court can consider matters subject to judicial notice in resolving Rule 12(b)(6) motion); Fed. R. Evid. 201(b) (a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Shad* v. *Dean Witter Reynolds, Inc.*, 799 F.2d 525, 531 (9th Cir. 1986) (noting district court took judicial notice of NYSE and NASD rules); *Retail Wholesale & Dept. Store Union Local 338 Ret. Fund* v. *Hewlett-Packard Co.*, 52 F. Supp. 3d 961, 964 n.1 (N.D. Cal. 2014) (taking judicial notice of NYSE rule).

which in turn caused the market to perceive excessive demand for wheat, increasing the value of Lansing's CBOT wheat futures long positions. But the Complaint never alleges there was anything "false" about that signal. Lansing cancelled the shipping certificates for load out, and the Complaint never alleges that Lansing did not load out the wheat. In other words, the Complaint's factual allegations show that Lansing sent a *true* signal of demand. It actually demanded wheat. And Lansing could not have sent a false signal of *additional* demand for wheat since the only thing that purchasing shipping certificates accomplished was to transfer ownership of the certificates of wheat from one market participant to another.

To plead falsity of a signal, a plaintiff must plead *facts* showing that the signal was false; conclusory assertions are insufficient. *See Spector*, 2017 WL 4283711, at *1 ("mere allegation of falsity" is "conclusory" and "not entitled to assumption of truth" under *Twombly*); *ATSI Commc'ns, Inc.*, 493 F.3d at 100-01 (same). Plaintiffs' CEA claims fail for the simple reason that *truthful* signals cannot form the basis of a claim under either Section 9(a)(2) or Section 6(c)(1). Truthful information cannot create the artificial prices necessary for a Section 9(a)(2) claim, because truthful information necessarily conveys accurate information about market supply and demand, the key factors in assessing price artificiality. *See Sullivan & Long*, 47 F.3d at 861-62. And accurate information cannot show the fraudulent conduct necessary to make out a Section 6(c)(1) claim because conveying accurate information is not materially misleading. *See Basic Inc.* v. *Levinson*, 485 U.S. 224, 238-40 (1988) (material misrepresentation necessary to state a securities fraud claim under Section 10(b)); *Ploss*, 197 F. Supp. 3d at 1053 (noting that case law under Section 10(b) guides the interpretation of Section 6(c)(1)); *see also In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1046-47 (N.D. Ill. 1995) (collecting authority that conveying *false* information to the market can support a manipulation claim without ever suggesting truthful

16

information can). In sum, because the Complaint fails to allege that the "signal" Lansing sent was false, the Court should dismiss Counts I and II.

The Court should dismiss Count I for the additional reason that Plaintiffs' allegations with regard to futures prices do not support a plausible inference that those prices were artificially "inflated" on every day between March 6 and March 13, but somehow not artificial on March 3. *See* ¶ 93.

## III. Plaintiffs Do Not State A Claim For Principal-Agent Liability (Count III) Or Aiding And Abetting (Count IV).

As Plaintiffs' claims of manipulation fail, so do their claims for principal-agent liability and adding and abetting liability under the CEA. Where a plaintiff does not plausibly state a manipulation claim sufficient to survive a motion to dismiss, its claims for both principal-agent liability and aiding and abetting necessarily fail. *Rough Rice*, 2012 WL 473091, at *7 (dismissing principal-agent and aiding and abetting claims for failure to plead underlying manipulation claim); *Dairy Farmers*, 60 F. Supp. 3d at 967.

## IV. The Antitrust Claim (Count VI) Fails For Lack Of An Unlawful Agreement, Market Power, Or Anticompetitive Effects.

Plaintiffs tack on an antitrust claim under Section 1 of the Sherman Act. ¶¶ 134-41. Plaintiffs fail to state such a claim for four related reasons: (a) they do not plead a *per se* violation; (2) they do not plead facts showing that Defendants entered into an unlawful antitrust conspiracy; (3) they do not plead the required market power; and (4) they do not plead any facts—or even articulate a coherent theory—as to how Lansing and Cascade's conduct caused anticompetitive effects.

### A. Plaintiffs Fail to Allege a *Per Se* Violation of Section 1.

Plaintiffs claim that they have alleged a *per se* violation of Section 1. ¶ 139. They are not correct. An agreement that is a *per se* violation of Section 1 is conclusively presumed to be

illegal without any further inquiry into whether it caused anticompetitive effects. *Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*, 551 U.S. 877, 886 (2007). But the Supreme Court has admonished that "the *per se* rule is appropriate only after the courts have had considerable experience with the type of restraint at issue." *Id.* Voicing a similar concern, the Seventh Circuit has "cautioned against over-zealous applications of the *per se* doctrine and has noted a judicial reluctance to extend its use." *Bunker Ramo Corp.* v. *United Business Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir. 1983). And "the mere attachment of a *per se* label by a plaintiff to defendants' conduct does not automatically invoke the *per se* doctrine and eliminate the requirement that the plaintiff allege and prove the anticompetitive effects of defendants' conduct." *UNR Indus., Inc.* v. *Continental Ins. Co.*, 607 F. Supp. 855, 859 (N.D. Ill. 1984).

Plaintiffs fail to allege a *per se* case. Post-*Leegin*, *per se* violations require "horizontal restraints," which are restraints "imposed by agreement between competitors." *Ohio* v. *Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018). The only alleged named conspirators are Lansing and Cascade.[10] Lansing is a grain merchandiser. ¶ 31. Cascade is a publisher of a newsletter about wheat markets. ¶ 32. There is no allegation that Lansing and Cascade compete with each

---

[10] That the Complaint alleges that Lansing employees Flavin and Grady, and Cascade employee Conway, participated in the conspiracy does not change this. Under the *Copperweld* doctrine, each of those employees is considered one and the same with their employer. *See Copperweld Corp.* v. *Independence Tube Corp.*, 467 U.S. 752, 769 (1984). And the Court should disregard the allegations as to the John Doe Defendants. *See W. Bend Mut. Ins. Co*, 844 F.3d at 675; *Swanson* v. *Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010) ("A more complex case involving . . . antitrust violations, will require more detail, both to give the opposing party notice of what the case is all about and to show how, in the plaintiff's mind at least, the dots should be connected."); *Commonwealth of Penn. ex rel. Zimmerman* v. *PepsiCo, Inc.*, 836 F.2d 173, 182 (3d Cir. 1988) (court explains that "vital allegations in stating a cause of action under the Sherman or Clayton acts are similar to those in any civil conspiracy case" and that plaintiffs must allege sufficient details such as "who made the statements, where, when or to whom" (quoting *Black & Yates* v. *Mahogany Ass'n*, 129 F.2d 227, 231-32 (3d Cir. 1941))); *Wojcik* v. *InterArch, Inc.*, No. 13-cv-1332, 2013 WL 5904996, at *12 (N.D. Ill. Nov. 4, 2013) (dismissing conspiracy claim because "Plaintiffs have not alleged any of the 'critical details'—the 'who, what, when, where, and how'—of the conspiracy").

other for anything, and therefore they cannot engage in a *per se* antitrust conspiracy with each other as a matter of law. *See Am. Express Co.*, 138 S. Ct. at 2283; *Bel Canto Design, Ltd.* v. *MSS HiFi, Inc.*, No. 11 C 6353, 2012 WL 2376466, at \*8 (S.D.N.Y. June 20, 2012) (*per se* rule did not apply because there was no allegation of an agreement between competitors); *Solent Freight Servs., Ltd.* v. *Alberty*, 914 F. Supp. 2d 312, 321 (E.D.N.Y. 2012) (same).

In addition, the Complaint contains no other allegations of a *per se* violation. "[P]rice fixing, group boycotts, market allocation, and certain types of tying agreements" are *per se* illegal. *Bunker Ramo Corp.*, 713 F.3d at 1284. The Complaint labels Defendants' conspiracy as one to "fix[] the prices" of CBOT wheat futures and options. ¶ 137. But that is a conclusory allegation the Court should disregard under *Twombly*. 550 U.S. at 555. The Complaint alleges no facts in support of it. To the contrary, all the Complaint alleges is that Lansing bought wheat to send a signal of demand, and Cascade amplified that signal through its newsletter. ¶¶ 8-9, 86. The Complaint never alleges that Cascade and Lansing agreed on prices, much less articulates how they could even do so, since Cascade does not buy or sell wheat.

Plaintiffs must therefore meet the elements of a Rule-of-Reason case and allege, among other things, (1) an unlawful agreement, (2) market power, and (3) anticompetitive effects. *See Slep-Tone Entm't Corp.* v. *Elwood Enters., Inc.*, 165 F. Supp. 3d 705, 713 (N.D. Ill. 2015) (the rule of reason "requires a showing that the alleged violator has '*market power*' through *an agreement* that has produced adverse or *anticompetitive effects* within the relevant" market (emphasis added) (citing *Menasha Corp.* v. *News Am. Mktg. In–Store, Inc*. 354 F.3d 661, 663 (7th Cir.2004))). Plaintiffs do not allege any of those three elements of their claim.

**B.      Plaintiffs Do Not Allege the Existence of an Unlawful Agreement to Restrain Trade.**

The Complaint alleges a conspiracy to "send[] false and misleading signals into the market for demand" through which Defendants "fix[ed] the prices of CBOT wheat futures and options at artificial levels that did not accurately reflect market demand for prices of shipping certificates in the physical or cash wheat market, instead of the prices that would have been set by competitive market forces." ¶¶ 136-37; *see also id.* ¶¶ 36, 41, 65, 81 (describing Cascade's alleged participation). In other words, Plaintiffs base their Section 1 claim on a supposed agreement between Lansing and Cascade to disseminate the same alleged false signal that underlies Plaintiffs' CEA claims. Plaintiffs fail to allege an unlawful agreement under Section 1 for three reasons.

*First*, the Complaint fails to allege any false misrepresentation. As the leading antitrust treatise explains, alleged misrepresentations must be "clearly false" to support an antitrust claim founded on deception. *See* III.B P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 782b (3d ed. 2013). As discussed above, however, the Complaint does not allege that Lansing did not load out wheat. There was nothing false about the alleged "signal" of demand that the Complaint alleges Defendants agreed to send. [11]

*Second*, the alleged agreement to disseminate a false signal about demand could only violate the Sherman Act if it somehow protected Lansing from competition. *See Caribbean Broad. Sys., Ltd.* v. *Cable & Wireless P.L.C.*, 148 F.3d 1080, 1087 (D.C. Cir. 1998) (addressing Section 1 and 2 claims, and holding that Plaintiffs would state a claim by alleging that "the defendants made fraudulent misrepresentations . . . *in order to protect their monopoly*"

---

[11] As discussed above, moreover, the Complaint's allegations show that all Lansing's purchase of shipping certificates could have done is "signal" a *transfer* of demand, not *increased* demand. *See* p.16 & n.11 above.

(emphasis added)). Yet the Complaint never alleges in even cursory fashion that the object of the conspiracy was to protect Lansing from competition. The only theory even suggesting harm to competition that the Complaint articulates is price-fixing which, as discussed above, it does not adequately plead. *See* § IV.A above. And, as explained below in Section D, the most likely consequence of the agreement would be to *spur* competition. Accordingly, even if the Court accepts the proposition that Lansing and Cascade agreed to disseminate a false signal, Plaintiffs fail to allege an unlawful conspiracy under the Sherman Act.

*Third*, even if the Complaint alleged that Lansing was acting to protect itself from competition (and it does not), the Complaint would *still* fail for want of factual allegations that *Cascade* joined an unlawful conspiracy to protect Lansing from competition. To show that Cascade agreed to join such an unlawful conspiracy, the Complaint must allege facts showing that Cascade "had a conscious commitment to a common scheme designed to achieve" the "unlawful objective" of protecting Lansing from competition. *See Monsanto Co.* v. *Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). The Complaint alleges no facts showing that Cascade agreed to do that. Nor does the Complaint even hint at any possible motive Cascade would have to do so. And because a Section 1 case requires concerted action among two or more firms, the failure to allege that Cascade joined the conspiracy dooms Plaintiffs' claims as to both Lansing and Cascade. *See Copperweld*, 467 U.S. at 768 (Section 1 only reaches only conduct "between *separate* entities," not "wholly unilateral" action).

C.      **Plaintiffs Fail to Allege Market Power.**

"Market power is a necessary ingredient in every case under the Rule of Reason." *Ball Mem. Hosp., Inc.* v. *Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986); *see also Am. Express Co.*, 138 S. Ct. at 2284 ("The rule of reason requires courts to conduct a fact-specific

assessment of market power and market structure . . . to assess the [restraint]'s actual effect on competition." (ellipses in original; quotation omitted)).

Here, the Complaint contains no allegations of market power. The Complaint appears to define the market as the "CBOT wheat futures and options contract market." ¶ 139. The Complaint contains no allegations justifying that as a proper antitrust market. Even if it is, however, the Complaint is devoid of any allegations that the Defendants had power in that market. "Market power comes from the ability to cut back the market's total output and so raise price." *Ball Mem. Hosp.*, 784 F.2d at 1335. The Complaint contains no allegations that Lansing has any power to reduce output in the broad "CBOT wheat futures and options contract" market and so control prices. That "market" is incredibly broad, encompassing at least six distinct CBOT wheat futures contracts, and associated options, that are traded constantly. *See, e.g.*, ¶ 27 (alleging Blue Marlin had 700 individual trades in CBOT wheat futures or options in March 2015 alone). CME Group reports that the average daily trading volume of wheat futures contracts in 2015 was 183,000 contracts, showing that Lansing's purported ownership of of 384 shipping certificates was a miniscule share of the overall market. *See* CME Group 2015 Annual Report at 48.[12] The only allegation in the Complaint about Lansing's size in the market is that it

___

[12] The report is available at http://files.shareholder.com/downloads/CME/6414754779x0x885497/A2C4AC87-2543-4BA9-B3E2-97392FBEFC96/CME_Group_2015_Annual_Report.pdf. As stated above, in ruling on a motion to dismiss, courts can consider matters that are proper subjects of judicial notice under Federal Rule of Evidence ("FRE") 201, *see Reed*, 906 F.3d at 548, which includes a fact "that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201. Lansing asks this Court to take judicial notice of the average daily trading volume in the wheat futures market set out in the annual report of CME Group. *See ScripsAmerica, Inc.* v. *Ironridge Global LLC*, 119 F. Supp. 3d 1213, 1253 (C.D. Cal. 2015) ("[T]he court *sua sponte* takes judicial notice of the volume of Scrips' shares traded from December 1, 2013 to April 28, 2014."); *Loveman* v. *Lauder*, 484 F. Supp. 2d 259, 268 n.48 (S.D.N.Y. 2007) ("The Court agrees that it may take judicial notice of the closing price and volume of trading of ELC shares on the date in question.").

controlled 100% of the available shipping certificates on March 9-11, 2015. ¶¶ 7, 88. But the Complaint never alleges how that control gave Lansing market power in the broader "CBOT wheat futures and options contract market." ¶ 139. Put simply, the Complaint fails to contain even the most rudimentary allegations necessary to establish market power.

      **D.**      **Plaintiffs Fail to Allege Any Anticompetitive Effects.**

The Complaint also fails to allege anticompetitive effects, an essential element of a Rule-of-Reason Section 1 claim. *See Banks* v. *National Collegiate Athletic Ass'n*, 977 F.2d 1081, 1087-88 (7th Cir. 1992) (affirming dismissal of Section 1 claim for failure to allege anticompetitive effects). The Complaint merely contains the conclusory statement that "the conspiracy resulted in substantial anticompetitive effects in the CBOT wheat futures and options contract market." ¶ 139. But there are no facts to support or explain this statement. The Court should disregard it entirely. *See W. Bend Mut. Ins. Co*, 844 F.3d at 675.

Further, Plaintiffs never allege facts showing how an agreement to scheme to inflate prices among non-competitors like Lansing and Cascade could harm competition. As noted above, Lansing and Cascade are not competitors and so any agreement among them cannot by itself reduce competition. And the Complaint never alleges how their agreement could otherwise reduce competition. The Complaint does not allege that the scheme prevented competitors from competing in or entering the market. And to the extent the Complaint alleges that the agreement produced higher prices, that would normally *increase* the likelihood that competitors would enter the market and compete. *See Lerma* v. *Univision Commc'ns. Inc.*, 52 F. Supp. 2d 1011, 1020 (E.D. Wis. 1999) ("A monopolist's raising of prices, in fact, is a *pro* competitive act. The higher a monopolist's prices, the greater the opening for competitors." (citing *Blue Cross & Blue Shield United* v. *Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995))). Thus, in the absence of additional exclusionary practices, a scheme to increase prices spurs rather than hinders

competition. *See Blue Cross*, 65 F.3d at 1413 (higher prices alone are "an attracting rather than an excluding practice"); *cf. Klein Prods. LLC* v. *Int'l Paper Co.*, 831 F.3d 919, 924 (7th Cir. 2016) (noting that "high prices attract new entry from fringe competitors or imports" and a Section 1 conspiracy would only expand the market shares of its participants if they "successfully use[] exclusionary devices"). Yet Plaintiffs only allege that Lansing and Cascade entered into a conspiracy to increase futures and options prices, with no corresponding exclusionary practices to foreclose competition. Thus, Plaintiffs' Complaint articulates no coherent theory nor makes any factual allegations showing that the conduct they challenge harmed competition, which is "fatal to the existence of a cause of action" under Section 1. *Car Carriers, Inc.* v. *Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984).

*     *     *

In sum, the antitrust claim is fatally defective on multiple, incurable grounds. The Supreme Court has made clear how important it is that district courts dismiss such legally untenable antitrust claims: "the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." *Twombly*, 550 U.S. at 558 (quoting *Car Carriers*, 745 F.2d at 1106). Plaintiffs' antitrust claim should be dismissed.

## V.     The Amended Complaint Fails To State A Claim For Unjust Enrichment (Count V).

Finally, Plaintiffs' unjust enrichment claim should be dismissed for two independent reasons. *First*, that claim is predicated on the "unlawful acts" underlying the CEA claims. ¶¶128-29. Because Plaintiffs do not state a claim under the CEA, they do not state an unjust enrichment claim. *Ass'n Benefit Servs., Inc.* v. *Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) (dismissing unjust enrichment claim predicated upon failed statutory claims); *Dairy Farmers*, 60

24

F. Supp. 3d at 970-71 (same). *Second*, "[i]t is axiomatic that an unjust enrichment claim is viable only when there is no adequate remedy at law." *Season Comfort Corp.* v. *Ben A. Borenstein Co.*, 655 N.E.2d 1065, 1071 (Ill. App. Ct. 1995). Because Plaintiffs have available to them remedies for violations of the CEA (if they can plead them, which they have not), they have adequate remedies at law.

**VI.    The Court Should Strike All Allegations Extending The Proposed Class Period Prior To March 6, 2015.**

Under Rule 12(f) and Rule 23, "courts may strike class allegations at the pleading stage when they are facially and inherently deficient, particularly when the dispute is not factual and discovery is unnecessary to resolve it." *Cowen* v. *Lenny & Larry's, Inc.*, No. 17 C 1530, 2017 WL 4572201, at *4 (N.D. Ill. Oct. 12, 2017) (quotation omitted). Here, Plaintiffs seek to represent a class of persons who transacted in CBOT wheat futures and options contracts from February 1, 2015 through March 31, 2015. ¶ 96. But the Complaint alleges that Lansing's conduct did not create artificial prices until March 6, 2015, when it first cancelled certificates for load out. ¶ 90 (prices "began to artificially increase on March 6, 2015"). Plaintiffs therefore cannot represent a class including those who transacted between February 1, and March, 6, 2015, because those purported class members could not have been injured by the alleged misconduct. Plaintiffs' proposed class "definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct," and therefore "is too broad" to be certified. *Kohen*, 571 F.3d at 677; *see also Oshana* v. *Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (affirming denial of class certification where "[c]ountless members of [the] putative class could not show any damage, let alone damage proximately caused by" the defendant's conduct). Accordingly, the Court should strike the allegation that the Class Period began on February 1, 2015, and confine the beginning of the proposed Class Period to March 6, 2015.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the Amended Complaint with prejudice or strike the proposed Class Period and confine it to March 6-31, 2015.

Dated: November 16, 2018

Respectfully submitted,

LANSING TRADE GROUP, LLC

/s/ J. Kevin McCall

J. Kevin McCall
Nicole A. Allen
Daniel T. Fenske
Thomas E. Quinn
Kevin J. Murphy
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: (312) 222-9350

*Attorneys for Defendant Lansing Trade Group, LLC*